JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KITE AND KEY GASTRO PUB, INC. | UTICA FIRST INSURANCE COMPANY |

**(b)** County of Residence of First Listed Plaintiff    Philadelphia, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Oriskany, NY
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kalikhman & Rayz, LLC
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006    Phone: (215) 364-5030

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
    Plaintiff

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 2  U.S. Government
    Defendant

☒ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |   Product Liability | |   28 USC 157 |   3729(a)) |
| ☐ 140 Negotiable Instrument |   Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |   Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|   & Enforcement of Judgment |   Slander |   Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |   Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |   Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|   Student Loans | ☐ 340 Marine |   Injury Product | |   New Drug Application | ☐ 470 Racketeer Influenced and |
|   (Excludes Veterans) | ☐ 345 Marine Product |   Liability | | ☐ 840 Trademark |   Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |   Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|   of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending |   Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |   Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |   Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |   Property Damage |   Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |   Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - |   Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| |   Medical Malpractice | |   Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |   Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |   Income Security Act |   or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party |   Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |   Sentence | |   26 USC 7609 |   Agency Decision |
| ☐ 245 Tort Product Liability |   Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | |   State Statutes |
| |   Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |   Other | ☐ 550 Civil Rights |   Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |   Conditions of | | | |
| | |   Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
  Proceeding

☐ 2  Removed from
  State Court

☐ 3  Remanded from
  Appellate Court

☐ 4  Reinstated or
  Reopened

☐ 5  Transferred from
  Another District
  *(specify)*

☐ 6  Multidistrict
  Litigation -
  Transfer

☐ 8  Multidistrict
  Litigation -
  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
  UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
08/31/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: c/o Kalikhman & Rayz, LLC 1051 County Line Road, Suite A Huntingdon Valley, PA 19006

Address of Defendant: 5981 Airport Road Oriskany, NY 13424

Place of Accident, Incident or Transaction: Philadelphia County

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☐

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/31/2020  _____  87976
_Attorney-at-Law / Pro Se Plaintiff_     _Attorney I.D. # (if applicable)_

---

**CIVIL: (Place a √ in one category only)**

**A.**  *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
*(Please specify):* 15 U.S.C. § 1692

**B.**  *Diversity Jurisdiction Cases:*

☑ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Arkady "Eric" Rayz , counsel of record *or pro se plaintiff*, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

DATE: _____  _____  87976
_Attorney-at-Law / Pro Se Plaintiff_     _Attorney I.D. # (if applicable)_

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

KITE AND KEY GASTRO PUB, INC.          :        CIVIL ACTION

                               :

                 v.               :

                               :

UTICA FIRST INSURANCE COMPANY       :        NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.      ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.      ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)      (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.      ( )

| __8/31/2020__ | _____ | __Plaintiff_____ |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 364-5030 | (215) 364-5029 | erayz@kalraylaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KITE AND KEY GASTRO PUB, INC. d/b/a Kite & Key, individually and on behalf of all others similarly situated,<br><br><div align="center">Plaintiff(s),</div><br><div align="center">v.</div><br>UTICA FIRST INSURANCE COMPANY,<br><br><div align="center">Defendant(s).</div> | CLASS ACTION COMPLAINT<br><br>Civil Action No.:<br><br><br>Jury Trial Demanded |

Kite and Key Gastro Pub, Inc. d/b/a Kite & Key ("Plaintiff"), individually and on behalf of all others similarly situated, brings this civil action against Utica First Insurance Company ("Utica" or "Defendant") and alleges as follows:

## I.  INTRODUCTION

1.       This is a civil action seeking: (i) a declaration that Defendant's denial of insurance coverage constitutes a breach of Defendant's insurance policy and violates the public policy of the Commonwealth of Pennsylvania; and (ii) monetary damages resulting from this breach of contract.

2.       Plaintiff owns, operates, manages, and/or controls the "Kite & Key" – a hybrid pub, bar, and restaurant that serves food and alcohol at 1836 Callowhill Street Philadelphia, PA 19130.

3.       In light of the Novel Coronavirus Disease of 2019 ("COVID-19") pandemic, various state and local authorities prohibited Plaintiff and similar establishments from offering in-store dining, regardless of any evidence of actual contamination of their premises.

4.       Efforts to prevent exposure to COVID-19 have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes ("Civil Authority Orders").

5.     Plaintiff's business is not considered "essential," and has therefore been subject to a variety of Closure Orders by state and local authorities, preventing Plaintiff from operating its business, limiting its operations, and/or prohibiting the use of the covered premises for its intended purpose.

6.     In accordance with these mandates, Plaintiff closed Kite & Key on March 16, 2020, and has been prohibited from reopening at its intended capacity.

7.     To protect its business in the event that the Kite & Key suddenly had to suspend operations for reasons outside of its control, Plaintiff purchased Business Owner's insurance coverage from Utica.

8.     Plaintiff and the proposed Class purchased and paid for an "all-risk" Commercial Property Coverage insurance policy from Defendant, which provides broad property insurance coverage for all non-excluded, lost business income, including the losses asserted here.

9.     Plaintiff's insurance policy with Defendant expressly includes "Business Income" coverage which promises to pay for loss due to the necessary suspension of operations following loss to property and "Civil Authority" coverage which promises to pay for losses caused by a civil or governmental authority that prohibits access to the covered property.

10.     Therefore, coverage exists for the losses Plaintiff sustained due to its compliance with the directives of state and local authorities.

11.     Defendant has refused to honor that policy and has failed to provide the coverage purchased by Plaintiff, despite Plaintiff's timely submission of notice of claim.

12.     Upon information and belief, Defendant has similarly refused to, or will refuse to, honor its obligations under the "all-risk" policy(ies) purchased by Plaintiff and the other members of the putative Class of insureds.

13.     As a result, Plaintiff, on behalf of itself and the putative Class, is entitled to relief,

as set forth herein.

## II.    THE PARTIES

14.    Plaintiff is a corporation, organized and existing under the laws of the Commonwealth of Pennsylvania.

15.    Defendant is a New York-based private insurance company with its headquarters at 5981 Airport Road Oriskany, NY 13424, and upon information and belief a citizen of the State of New York.

16.    Defendant conducts business throughout the United States and actively sells insurance policies in the states of Connecticut, Florida, Maryland, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, and Virginia.

## III.    JURISDICTION AND VENUE

17.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the sum or value of $75,000.00 and Plaintiff is a citizen of a state different from Defendant.

18.    The Eastern District of Pennsylvania is the proper venue for this litigation, because: (a) Plaintiff operates from a location in Philadelphia County, which is in the territory of the Eastern District of Pennsylvania; (b) Defendant's wrongful conduct was directed to and was undertaken within the Eastern District of Pennsylvania; and (c) Defendant conducts a substantial portion of its business in the Eastern District of Pennsylvania.

## IV.    FACTUAL ALLEGATIONS

### BACKGROUND

19.    As a retail hospitality establishment, Plaintiff's location is specifically designed for two or more people to congregate and spend time within Plaintiff's premises.

20.    Prior to March 16, 2020, "Kite & Key" was open for business seven days per week,

from 11:00 a.m. through 2:00 a.m., with a capacity to hold up to 150 patrons.

## DEFENDANT'S POLICY

21.    Plaintiff purchased a contract of insurance from Defendant, whereby Plaintiff agreed to make payments (in the form of premiums) to Defendant in exchange for Defendant's promise to indemnify Plaintiff for losses at the Covered Property, including, but not limited to business income losses.

22.    On or about June 26, 2019, Defendant issued a policy of insurance to Plaintiff, under designation Policy No. BOP 4464499 ("Policy"), for the period of June 26, 2019 through June 26, 2020.

23.    Plaintiff paid all premiums owed to Defendant under the Policy and Defendant accepted all such premiums from Plaintiff.

24.    The Policy is a form policy issued by Defendant.

25.    Plaintiff did not participate in the drafting or negotiation of the words used in the Policy.

26.    As the insured, Plaintiff had no leverage or bargaining power to alter or negotiate the terms of the Policy.

27.    The Policy is an "all-risk" policy, which provides the broadest property insurance coverage available.

28.    As an "all-risk policy" for Plaintiff's premises the Policy provides coverage for a loss, unless the loss is specifically excluded or limited by the Policy.

29.    Plaintiff's Policy provides for coverage for "loss of income" whether the loss or damage to property occurs on Plaintiff's premises or not.

30.    Specifically, the Policy contains "Endorsement BP 0200 (ed 06-12)" that provides coverages for "loss of income" in the event that access to Plaintiff's premises "is specifically

4

denied by an order of civil authority" that is:

> [A] result of damage to property other than at [Plaintiff's] premises that is caused by a covered peril, subject to the following:
>
> a.    [Plaintiff's] premises is . . . within one mile of the damaged property; and . . . within the area where access is denied by civil authority; and
>
> b.    the order is initiated . . . due to dangerous conditions as a result of the damage or continuation of the covered peril that caused the damage.

31. The Policy specifically states it will pay for the "loss of earnings and extra expenses incurred within 12 consecutive months after the date of **direct physical loss or damage to property**." (emphasis added).

32. The Policy does not define the phrase "direct physical loss of or damage to."

33. However, the use of the disjunctive "or" in the phrase "direct physical loss or damage to" means that coverage is triggered if either a physical loss of property or damage to property occurs.

34. Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy and/or continued use.

35. Pursuant to the terms of the Policy, Plaintiff agreed to make payments to Defendant, in exchange for Defendant's promise to indemnify Plaintiff for losses, including (but not limited to) business income losses and Plaintiff faithfully paid policy premiums to Defendant, *inter alia*, for such coverage.

36. Upon information and belief, the language set forth in the Policy is form language that is included verbatim in all of Defendant's insurance policies purchased by members of the proposed Class.

## CIVIL AUTHORITY ORDERS

37.    COVID-19 has spread, and continues to spread, rapidly across the United States and was declared a pandemic by the World Health Organization.    See, e.g., https://www.health.harvard.edu/diseases-andconditions/coronavirus-resource-center    (last accessed June 9, 2020).

38.    According to a study published in The New England Journal of Medicine, COVID-19 is widely accepted as a cause of real physical loss and damage.    See https://www.nih.gov/newsevents/news-releases/new-coronavirus-stable-hours-surfaces    (last accessed June 9, 2020).

39.    In response to the COVID-19 pandemic, on March 6, 2020, Pennsylvania Governor Tom Wolf issued a "Proclamation of Disaster Emergency" – the first formal recognition of an emergency situation in the Commonwealth as a result of COVID-19.  A true and correct copy of this document is marked and attached hereto as Exhibit "1."

40.    By this time the health crisis caused by COVID-19 was a staple of news coverage and there was little doubt that Defendant recognized the severity of the COVID-19 problem.

41.    On March 12, 2020, the City of Philadelphia Health Commissioner, Thomas Farley, issued an Emergency Order that forbade mass gatherings in the City of Philadelphia.

42.    Thereafter, on March 16, 2020, the Governor of Pennsylvania, Thomas W. Wolf, ordered that, effective March 17, 2020, all restaurants and bars must close their dine-in facilities, limiting their business to carryout, delivery, and drive-through, and prohibiting all eating and drinking inside restaurants and bars, such as Plaintiff's establishment.

43.    On March 17, 2020, the Mayor of the City of Philadelphia, James Kenney, and the Commissioner Farley jointly issued an Emergency Order prohibiting operation of non-essential businesses in the City of Philadelphia, including restaurants like Plaintiff's.

44.     On March 19, 2020 Governor Wolf issued an order requiring all non-life-sustaining businesses in Commonwealth to cease operations and close all physical locations ("Executive Order").  A true and correct copy of this document is marked and attached hereto as Exhibit "2."

45.     The Executive Order continued the dine-in prohibition for restaurants and bars.

46.     On March 22, 2020, the Mayor Kenney issued an Emergency Order Temporarily Prohibiting Operation of Non-Essential Businesses and Congregation of Persons to Prevent the Spread of 2019 Novel Coronavirus, ordering the closure of all businesses except those previously listed by the Governor Wolf as "Life-Sustaining Businesses," noting that "COVID-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain property and places."   A true and correct copy of this Order is marked and attached hereto as Exhibit "3."

47.     On March 23, 2020, Governor Wolf issued a "Stay-at-Home Order" for residents of Philadelphia, Allegheny, Bucks, Chester, Delaware, Monroe, and Montgomery Counties.  A true and correct copy of this Order is marked and attached hereto as Exhibit "4."

48.     Also, on March 23, 2020, the Pennsylvania Department of Health issued a similar Order, noting that "operation of non-life-sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID–19."  A true and correct copy of this Order is marked and attached hereto as Exhibit "5."

49.     On April 1, 2020, Governor Wolf extended the earlier "Stay at Home Order" to the entire Commonwealth of Pennsylvania.

50.     These directives (collectively, "Civil Authority Orders"), as they relate to the closure of all "non-life-sustaining businesses," evidence an awareness on the part of both state and local governments that COVID-19 causes damage to property.  This is particularly true in places

where business is conducted, such as Plaintiff's, as the requisite contact and interaction causes a heightened risk of the property becoming contaminated.

51.    The shut-down Civil Authority Orders issued by Pennsylvania authorities covering Pennsylvania non-essential businesses are similar to Civil Authority Orders that have been issued nationwide by state and local civil authorities, including each of the states in which Defendant writes insurance policies.    See    https://www.wsj.com/articles/a-state-by-state-guide-to-coronavirus-lockdowns-11584749351.

**IMPACT ON PLAINTIFF**

52.    Plaintiff's business is located approximately 0.2 miles of the Philadelphia Police Department's 9th District Headquarters, 0.8 miles from the Philadelphia Fire Department's Engine 43, 0.2 miles from a "Ride Aid" facility that includes a RediClinic, and .3 miles from a CVS Pharmacy.

53.    Upon information and belief, these nearby locations routinely and customarily destroy numerous items of physical property believed to be contaminated by COVID-19.

54.    Although there is no evidence of anyone contracting COVID-19 on Plaintiff's premises or contamination of the Covered Property, the government-mandated closure is physically impacting Plaintiff.

55.    As a result of the orders governing Plaintiff, the Covered Property closed on March 16, 2020 and remained closed, except for take-out service, until being allowed to partially re-open with restricted outdoor seating, in compliance with social distancing and sanitation procedures, on June 12, 2020.

56.    Although on March 18, 2020, Plaintiff began limited service of takeout, delivery, and growler fills from 4:00 p.m. through 9:00 p.m., its ordinary business operation has come to an end, as in-store dining constitutes approximately ninety (90) percent of Plaintiff's overall business

income.

57.     Any effort by Defendant to deny the reality that the virus causes physical loss and damage would constitute a false and potentially fraudulent misrepresentation that could endanger Plaintiff and the public.

58.     As a further direct and proximate result of the Civil Authority Orders, Plaintiff has been forced to furlough twenty-six (26) employees.

59.     Hence, as a result of the Civil Authority Orders at issue, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and additional expenses, each of which is expressly covered under the Policy.

60.     It is beyond any legitimate dispute that all property, including Plaintiff's property, has been damaged by COVID-19, because it is a physical substance, which lives on and is active on inert physical surfaces, that attached to and deprived Plaintiff of its property, resulting in direct physical loss.

61.     Indeed, when Governor Wolf's ability to issue the Executive Order was challenged in court, the Pennsylvania Supreme Court found that the Governor had the authority to issue such an order, because the COVID-19 pandemic qualified as a "natural disaster" that caused "substantial damage to property, hardship, suffering, or possible loss of life" in the Commonwealth.  See Friends of Devito, et al., v. Wolf, et al., ___ A.3d ___, 2020 WL 1847100 *10-12 (Pa. April 13, 2020).

62.     The Pennsylvania Supreme Court went on to dismiss the notion that there were no disasters in areas where the challengers' businesses were located.  Rather, it held that, regardless of evidence of any actual contamination, "any location (including [challengers]' businesses) where two or more people can congregate is within the disaster area" that is covered by the Executive Order.  Friends of Devito, 2020 WL 1847100 *13.

63. In other words, as stated by the Pennsylvania Supreme Court, Plaintiff's Covered Property is unfit for the carrying out of Plaintiff businesses, irrespective of any evidence of actual COVID-19 contamination.

64. As such, Plaintiff and members of the Class(es) have no access to their respective retail storefront locations, losing all or substantially all income.

65. As a result, Plaintiff's Covered Property suffered "direct physical loss or damage" due to the Civil Authority Orders (and other local governmental orders), prohibiting Plaintiff's use of the Covered Property as a dine-in eating and drinking establishment.[1]

66. The Civil Authority Orders, in and of themselves, constitute a Covered Cause of Loss within the meaning of the Policy.

67. Alternatively, and to the extent the Civil Authority Orders do not constitute a Covered Cause of Loss within the meaning of the Policy, the COVID-19 pandemic and the ubiquitous nature of the COVID-19 virus caused a direct physical loss of or damage to Plaintiff's Covered Property.

68. Further, and as an additional basis for coverage under the Policy, the ubiquitous nature of the COVID-19 virus caused direct physical loss of or damage to property other than Plaintiff's Covered Property, and such loss or damage resulted in an "action by civil authority" prohibiting access to Plaintiff's Covered Property, within the meaning of the Policy.

---

[1] To bolster the rationale of Friends of Devito, the U.S. Centers for Disease Control ("CDC") and the U.S. Occupational Safety and Health Administration ("OSHA") later published guidelines that businesses should now follow to eradicate physical damage caused by COVID-19 to their property, including cleaning and disinfecting. See https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html (last visited on August 31, 2020); https://www.osha.gov/SLTC/covid-19/ (last visited on August 31, 2020). Thus, damage caused by the COVID-19 pandemic is indistinguishable from that caused by other natural disasters. In other words, as stated by the Pennsylvania Supreme Court, by virtue of the governmental directives, Plaintiff was prohibited from using its premises, as they suffered "direct physical loss or damage" and became unfit for the carrying out of the insured's business.

69.    Additionally, Plaintiff's "dependent property" suffered direct physical loss or damage (as a result of the governmental shutdown orders or, alternatively, the ubiquitous nature of the COVID-19 virus), resulting in lost business income to Plaintiff, within the meaning of the Policy.

70.    After being devastated by the impact of COVID-19, Plaintiff promptly sought relief via the Policy by filing a claim with Defendant to cover its losses.

71.    By letter of March 27, 2020, Defendant denied coverage for any losses incurred by Plaintiff identified above, citing Endorsement BP 0200 (ed. 06-12), and asserting that the Policy "does not provide coverage," in light of a separate "Civil Authority" and "Virus Or Bacteria" exclusions in Endorsement BP 0200 (ed. 06-12).  A true and correct copy of the letter at issue is marked and attached hereto as Exhibit "6."

72.    However, the "Civil Authority" exclusion is not applicable to Plaintiff's claims, *inter alia*, because the Civil Authority Orders and other orders of civil authority are generally applicable to businesses, were not a result of any contamination of Plaintiff's particular property, and Plaintiff's property was not seized, confiscated, destroyed, quarantined, or the subject of any similar action.

73.    The "Virus or Bacteria" exclusions do not preclude coverage, *inter alia*, as Plaintiff's loss is not a result of the virus itself, but rather the effect of the Civil Authority Orders as the presence or absence of the COVID-19 virus would have no effect upon the closure or the loss of business inasmuch as the stay at home orders apply to all non-essential businesses regardless of their exposure to the virus.

74.    If an insurer desires to limit its liability under a policy, it must employ language that clearly and distinctly reveals its stated purpose.

75.    Exclusions from insurance coverage are to be interpreted narrowly.

11

76.     The clauses relied upon by Defendants for excluding coverage are unclear or obscure as they relate to the COVID-19 pandemic.

77.     As the Policy was drafted by Defendant, any ambiguities regarding coverage should be construed against Defendant and should be resolved in favor of coverage.

78.     Plaintiff, and the putative Class, objectively and reasonably expected their respective Policies would protect them.

79.     Defendant's denial of lost business income claims has left Plaintiff and the Class without vital coverage specifically acquired to ensure the survival of their businesses during this temporary suspension of operations.

80.     Upon information and belief, Defendant has issued similar denials to those insured under the same policy provisions on a uniform basis, without individual bases or investigations.

81.     Plaintiff and members of the Class have been (and will continue to be) financially damaged due to Defendant's conduct, as set forth herein.

82.     Plaintiff and members of the Class have suffered and will continue to suffer actual damages due to Defendant's conduct, as set forth herein.

83.     As such, Plaintiff, on behalf of itself and members of the Class, avers that Defendant's conduct, as described herein, was not limited to the circumstances described herein, but was, and is, habitual, systematic, ongoing, and unrelenting.

84.     Plaintiff further states that, absent judicial action, Defendant's practices will continue unabated.

## V.    CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action on behalf of itself and class(es) of similarly-situated individuals/entities pursuant to Fed. R. Civ. P. 23.

86.     Plaintiff seek to represent the following class defined as:

> All policyholders in the United States who purchased commercial
> property coverage, including business or interruption income (and
> extra expense) coverage from Defendant and who have been
> denied coverage under their policy for lost business income due to
> action of any civil authority, in response to the COVID-19
> pandemic, which required them to shut down or otherwise curtail
> or limit in any way their business operations (the "Class").

87.     Excluded from the Class is Defendant and any of its members, affiliates, parents,
subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and their
immediate family members.  Plaintiff reserves the right to modify/amend any or all of the class
definition set forth above, as appropriate, during the course of this litigation.

88.     This action may be properly maintained on behalf of the Class proposed herein
under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

89.     The number of members in the Class is so numerous that joinder of all members is
impracticable. The exact number of members of the Class can be determined by reviewing
Defendant's records. Plaintiff is informed and believes and thereon alleges that there are over a
hundred members in the defined Class.

90.     Plaintiff will fairly and adequately protect the interests of the Class and has retained
counsel that is experienced and competent in class action litigation.

91.     Plaintiff has no interests that are contrary to, or in conflict with, members of the
Class.

92.     A class action suit, such as the instant one, is superior to other available means for
fair and efficient adjudication of this lawsuit. The damages suffered by individual members of the
Class may be relatively small when compared to the expense and burden of litigation, making it
virtually impossible for members of the Class to individually seek redress for the wrongs done to
them.

93.     A class action is, therefore, superior to other available methods for the fair and

efficient adjudication of the controversy. Absent these actions, members of the Class likely will not obtain redress of their injuries, and Defendant will retain the proceeds of their unlawful conduct.

94.    Furthermore, even if any member of the Class could afford individual litigation against Defendant, it would be unduly burdensome to the judicial system. Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual members of the Class and provide for judicial consistency.

95.    There is a well-defined community of interest in the questions of law and fact affecting the Class as a whole.  The questions of law and fact common to each of the members of the Class predominate over any questions affecting solely individual members of the action. Among the common questions of law and fact are:

    a.    Whether Plaintiff and members of the Class suffered a covered loss as defined in Defendant's policies issued to members of the Class;

    b.    Whether Defendant denied all claims based on the wrongful application of one or more policy exclusion;

    c.    Whether Defendant breached its contracts of insurance through a blanket denial of all claims based on business interruption related to the Interruption Orders;

    d.    Whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

    e.    Whether Plaintiff and members of the Class are entitled to equitable, declaratory and/or other relief, and if so, the nature of such relief.

96.    Plaintiff's claims are typical of the claims of members of the Class.

97.    Plaintiff and members of the Class have sustained damages arising out the same

14

wrongful and uniform practices of Defendant.

98.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its continued maintenance.

## COUNT I
## BREACH OF CONTRACT
## (Individually and On Behalf of the Class)

99.     Plaintiff, on behalf of itself and the Class, realleges and incorporates by reference the paragraphs above as if they were forth again herein.

100.     Plaintiff brings this count individually and on behalf of the other members of the Class.

101.     Plaintiff's Policy, as well as Defendant's policies extended to members of the Class, are contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff and the other Class members' losses for covered claims.

102.     The losses sustained by Plaintiff and members of the Class as a result of the Civil Authority Orders are covered under Plaintiff's Policy, as well Defendant's policies extended to members of the Class.

103.     Defendant agreed to pay Plaintiff and members of the Class for the losses incurred in connection with the Civil Authority Orders.

104.     Plaintiff and members of the Class have complied with all applicable provisions of their policies with Defendant, these provisions have been waived by Defendant, or Defendant is estopped from asserting them.

105.     By denying coverage for the losses incurred by Plaintiff and members of the Class in connection with the Civil Authority Orders, Defendant has breached its coverage obligations under its policies.

106.     As a result of Defendant's breaches of the policies, Plaintiff and members of the

Class have sustained substantial damages for which Defendant is liable, in an amount to be established at trial.

## COUNT II
## DECLARATORY JUDGMENT
## (Individually and on Behalf of the Class)

107.    Plaintiff, on behalf of itself and the Declaratory Judgment Class, re-alleges and incorporates by reference the paragraphs above as if they were set forth again herein.

108.    Plaintiff brings this count individually and on behalf of the other members of the Class.

109.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that, in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

110.    An actual controversy has arisen between the rights of Plaintiff and members of the Class and Defendant's obligations under the policies to reimburse Plaintiff for the full amount of losses incurred by Plaintiff and members of the Class in connection with the Orders.

111.    Resolution of the duties, responsibilities and obligation of the parties is necessary as no adequate remedy at law exists and a declaration of the Court is needed to resolve the dispute and controversy.

112.    Pursuant to 28 U.S.C. § 2201, Plaintiff and members of the Declaratory Judgment Class seek a declaratory judgment from the Court declaring the following:

      a.    Plaintiff and members of the Class losses' in connection with the Orders are insured under Defendant's policies; and

      b.    Defendant is obligated to pay Plaintiff and members of the Class for the full amount of the losses incurred and to be incurred in connection with the

Orders.

## VI.    <u>CLAIM FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully prays for:

A.    Designation of this action as a class action pursuant to Fed. R. Civ. P. 23;

B.    Designation of Plaintiff as representative of the Class;

C.    Designation of Plaintiff's counsel as class counsel for the Class;

D.    A Declaration that Defendant has violated the applicable provisions of its policies;

E.    Entering declaratory judgment on Count II in favor of Plaintiff and the members of the Class;

F.    An Order enjoining Defendant from any further breaches of its policies;

G.    Actual damages;

H.    An Order requiring Defendant to pay post-judgment interest on any amounts awarded; and

I.    Such other relief as the Honorable Court shall deem just and appropriate.

## VII.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury as to all issues so triable.

**(SIGNATURE ON THE NEXT PAGE)**

Dated: <u>August 31, 2020</u>

Respectfully submitted,
**KALIKHMAN & RAYZ, LLC**

_____
Arkady "Eric" Rayz
1051 County Line Road, Suite "A"
Huntingdon Valley, PA 19006
Telephone:  (215) 364-5030
Facsimile:  (215) 364-5029
E-mail: erayz@kalraylaw.com

**CONNOLLY WELLS & GRAY, LLP**
Gerald D. Wells, III
Robert J. Gray
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone:  (610) 822-3700
Facsimile:  (610) 822-3800
E-mail: gwells@cwglaw.com
        rgray@cwglaw.com

Counsel for Plaintiff and the Proposed
Class(es)

18

# EXHIBIT 1



COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE GOVERNOR

*PROCLAMATION OF DISASTER EMERGENCY*

*March 6, 2020*

**WHEREAS,** *a novel coronavirus (now known as "COVID-19") emerged in Wuhan, China, began infecting humans in December 2019, and has since spread to 89 countries, including the United States; and*

**WHEREAS,** *the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared COVID-19 a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

**WHEREAS,** *the Commonwealth of Pennsylvania ("Commonwealth") has been working in collaboration with the CDC, HHS, and local health agencies since December 2019 to monitor and plan for the containment and subsequent mitigation of COVID-19; and*

**WHEREAS,** *on February 1, 2020, the Commonwealth's Department of Health activated its Department Operations Center at the Pennsylvania Emergency Management Agency's headquarters to conduct public health and medical coordination for COVID-19 throughout the Commonwealth; and*

**WHEREAS,** *on March 4, 2020, the Director of the Pennsylvania Emergency Management Agency ordered the activation of its Commonwealth Response Coordination Center in support of the Department of Health's Department Operations Center, to maintain situational awareness and coordinate the response to any potential COVID-19 impacts across the Commonwealth; and*

**WHEREAS,** *as of March 6, 2020, there are 233 confirmed and/or presumed positive cases of COVID-19 in the United States, including 2 presumed positive cases in the Commonwealth; and*

**WHEREAS,** *while it is anticipated that a high percentage of those affected by COVID-19 will experience mild influenza-like symptoms, COVID-19 is a disease capable of causing severe symptoms or loss of life, particularly to older populations and those individuals with pre-existing conditions; and*

**WHEREAS,** *it is critical to prepare for and respond to suspected or confirmed cases in the Commonwealth and to implement measures to mitigate the spread of COVID-19; and*

**WHEREAS,** *with 2 presumed positive cases in the Commonwealth as of March 6, 2020, the possible increased threat from COVID-19 constitutes a threat of imminent disaster to the health of the citizens of the Commonwealth; and*

**WHEREAS,** *this threat of imminent disaster and emergency has the potential to cause significant adverse impacts upon the population throughout the Commonwealth; and*

**WHEREAS,** *this threat of imminent disaster and emergency has already caused schools to close, and will likely prompt additional local measures, including affected county and municipal governments to declare local disaster emergencies because of COVID-19; and*

*WHEREAS, this threat of imminent disaster and emergency situation throughout the Commonwealth is of such magnitude and severity as to render essential the Commonwealth's supplementation of emergency resources and mutual aid to the county and municipal governments of this Commonwealth and to require the activation of all applicable state, county, and municipal emergency response plans.*

*NOW THEREFORE, pursuant to the provisions of Subsection 7301(c) of the Emergency Management Services Code, 35 Pa. C.S. § 7101, et seq., I do hereby proclaim the existence of a disaster emergency throughout the Commonwealth.*

*FURTHER, I hereby authorize the Pennsylvania Emergency Management Agency Director or his designee, to assume command and control of all statewide emergency operations and authorize and direct that all Commonwealth departments and agencies utilize all available resources and personnel as is deemed necessary to cope with this emergency situation.*

*FURTHER, I hereby transfer up to $5,000,000 in unused appropriated funds to the Pennsylvania Emergency Management Agency for Emergency Management Assistance Compact expenses related to this emergency, to be decreased as conditions require, pursuant to the provisions of section 7604(a) of the Emergency Management Services Code, 35 Pa. C.S. § 7604(a). In addition, I hereby transfer up to $20,000,000 in unused appropriated funds, to be decreased as conditions require, to the Pennsylvania Emergency Management Agency pursuant to section 1508 of the Act of April 9, 1929 (P.L.343, No. 176) (the Fiscal Code), 72 P.S. § 1508. The aforementioned funds shall be used for expenses authorized and incurred related to this emergency. These funds shall be credited to a special account established by the Office of the Budget. I hereby direct that any funds transferred herein that remain unused after all costs related to this emergency have been satisfied shall be returned to the General Fund.*

*FURTHER, All Commonwealth agencies purchasing supplies or services in response to this emergency are authorized to utilize emergency procurement procedures set forth in Section 516 of the Commonwealth Procurement Code, 62 Pa. C.S. § 516. This Proclamation shall serve as the written determination of the basis for the emergency under Section 516.*

*FURTHER, I hereby suspend the provisions of any regulatory statute prescribing the procedures for conduct of Commonwealth business, or the orders, rules or regulations of any Commonwealth agency, if strict compliance with the provisions of any statute, order, rule or regulation would in any way prevent, hinder, or delay necessary action in coping with this emergency. Commonwealth agencies may implement emergency assignments without regard to procedures required by other laws, except mandatory constitutional requirements, pertaining to performance of public work, entering into contracts, incurring of obligations, employment of temporary workers, rental of equipment, purchase of supplies and materials, and expenditures of public funds.*

*FURTHER, pursuant to the powers vested in me by the Constitution and laws of the Commonwealth pursuant to 51 Pa. C.S. § 508, I hereby authorize the Adjutant General of Pennsylvania to place on state active duty for the duration of the emergency disaster proclamation, such individuals and units of the Pennsylvania National Guard, for missions designated by the Pennsylvania Emergency Management Agency, as are needed to address the consequences of the aforementioned emergency.*

*FURTHER, I authorize the Commissioner of the Pennsylvania State Police to use all available resources and personnel in whatever manner he deems necessary during this emergency to assist the actions of the Pennsylvania Emergency Management Agency in addressing the consequences of the emergency.*

*FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Health, in her sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Health is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.*

FURTHER, I hereby authorize the Secretary of the Pennsylvania Department of Education, in his sole discretion, to suspend or waive any provision of law or regulation which the Pennsylvania Department of Education is authorized by law to administer or enforce, for such length of time as may be necessary to respond to this emergency.

FURTHER, if investigations made on my behalf determine that the Commonwealth needs greater flexibility in the application of state and federal motor carrier regulations to accommodate truck drivers involved in emergency activities during this emergency, I hereby direct the Commonwealth Department of Transportation to waive or suspend any laws or federal or state regulations related to the drivers of commercial vehicles.

FURTHER, I hereby direct that the applicable emergency response and recovery plans of the Commonwealth, counties, municipalities and other entities be activated as necessary and that actions taken to implement those plans be coordinated through the Pennsylvania Emergency Management Agency.

STILL FURTHER, I hereby urge the governing bodies and executive officers of all political subdivisions affected by this emergency to act as necessary to meet the current exigencies as legally authorized under this Proclamation, namely, by the employment of temporary workers, by the rental of equipment, and by entering into such contracts and agreements as may be required to meet the emergency, all without regard to those time consuming procedures and formalities normally prescribed by law, mandatory constitutional requirement excepted.



GIVEN under my hand and the Seal of the Governor, at the City of Harrisburg, this sixth day of March in the year of our Lord two thousand twenty, and of the Commonwealth the two hundred and forty fourth.

TOM WOLF
Governor

# EXHIBIT 2



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*ORDER OF*

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING*

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

*Section 1:      Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons.  A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

Section 2:     *Prohibition on Dine-In Facilities including Restaurants and Bars*

*All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

*Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

Section 3:     *Effective Date and Duration*

*This order is effective immediately and will remain in effect until further notice.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*

# EXHIBIT 3



CITY OF PHILADELPHIA

OFFICE OF THE MAYOR
DEPARTMENT OF PUBLIC HEALTH

EMERGENCY ORDER TEMPORARILY PROHIBITING OPERATION OF
NON-ESSENTIAL BUSINESSES AND CONGREGATION OF PERSONS
TO PREVENT THE SPREAD OF 2019 NOVEL CORONAVIRUS (COVID -19)

### ORDER NO. 2

**WHEREAS,** on March 6, 2020, in response to the 2019 novel coronavirus disease, COVID-19, the Governor of Pennsylvania issued a Proclamation of Disaster Emergency; and

**WHEREAS,** on March 11, 2020, the World Health Organization declared the COVID-19 outbreak a pandemic, or global epidemic; and

**WHEREAS,** on March 11, 2020, the Mayor of Philadelphia issued a Declaration of Extraordinary Circumstance that allows City regulations related to addressing the pandemic to become effective immediately upon transmission to the Department of Records; and

**WHEREAS,** on March 12, 2020, the Board of Health added COVID-19 to the City's list of reportable and quarantinable diseases; and

**WHEREAS,** on March 12, 2020, the Commissioner of Health issued an Emergency Order that forbids gatherings of 1,000 or more persons to prevent the spread of COVID-19; and

**WHEREAS,** on March 13, 2020, the Mayor issued a Declaration of Emergency related to COVID-19 that, in conjunction with the Governor's proclamation, enhanced the City's ability to take action to address the pandemic's impact in Philadelphia;

**WHEREAS,** on March 16, 2020, the Governor of Pennsylvania announced that the Commonwealth of Pennsylvania is imposing mitigation efforts to curtail the spread of COVID-19 uniformly across the Commonwealth, calling upon nonessential businesses (excluding business such as grocery stores and medical facilities) to close beginning at midnight Tuesday March 17, 2020; and

**WHEREAS,** on March 17, 2020 the Mayor and the Commissioner of Health jointly issued an Emergency Order prohibiting operation of non-essential businesses to prevent the spread of COVID-19; and

**WHEREAS,** on March 19, 2020 the Governor of Pennsylvania announced that the Commonwealth of Pennsylvania ordered all non-life-sustaining businesses in Pennsylvania to close their physical

locations as of 8:00 p.m., March 19 to slow the spread of COVID-19 and that enforcement actions against businesses that do not close physical locations will begin at 12:01 a.m. Saturday, March 21; and

**WHEREAS,** the Governor of Pennsylvania updated the aforementioned order and list of life-sustaining and non-life sustaining businesses on March 20, 2020 and again on March 21, 2020; and

**WHEREAS,** COVID-19 is easily transmitted, especially in group settings, including by people with no symptoms or mild symptoms who may unknowingly spread the disease to others; and

**WHEREAS,** COVID-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain property and places; and

**WHEREAS,** COVID-19 can cause severe disease and death, particularly in older adult and other vulnerable populations; and

**WHEREAS,** pursuant to authority set forth in The Philadelphia Code, inherent authority set forth in The Philadelphia Home Rule Charter, and state law, the Mayor has broad authority to set forth limitations on public activities during a state of national health emergency; and

**WHEREAS,** Sections 6-205 and 6-206 of The Philadelphia Code provides that the Department may forbid congregation of persons and such other measures, including closure of businesses when necessary to prevent the further spread of a communicable and quarantinable disease; and

**WHEREAS,** scientific evidence shows that preventing unnecessary close contact of individuals is an effective way to mitigate the spread of communicable diseases like COVID-19; and

**WHEREAS,** the Mayor of the City of Philadelphia and the Health Commissioner have determined that, in order to limit the spread of COVID-19, it is immediately necessary to forbid the operation of businesses that do not provide essential services to the public and activities that endanger public health, in accordance with the terms and conditions set forth herein;

**WHEREAS,** the best way for Philadelphia residents to keep themselves, their families, and their communities safe during the COVID-19 outbreak is to stay at home as much as possible;

**NOW, THEREFORE,** James F. Kenney, Mayor of the City of Philadelphia, and Dr. Thomas A. Farley, Health Commissioner of the City of Philadelphia, pursuant to all authority granted under the Philadelphia Home Rule Charter, The Philadelphia Code, the Regulations of the Board of Health of the City of Philadelphia, and Pennsylvania laws and regulations, hereby **ORDER** as follows:

**Section 1.    Prohibition on Operation of Non-Essential Businesses/Activities in Philadelphia**

A.    No person or entity shall operate a non-essential place of business. This prohibition does not apply to virtual or remote operations (*e.g.*, work from home).

2

B.    Essential Businesses may operate during the term of this Order and must observe the Social Distancing Rules of 4.

C.    Essential Businesses include all Life-Sustaining Businesses in the specific industry groups identified by the Governor of Pennsylvania, specifically those permitted in Natural Resources and Mining; Construction; Manufacturing; Trade, Transportation, & Utilities; Information; Financial Activities; Professional and Business Services; Education and Health Services; Leisure and Hospitality; and Other Services (Except Public Administration) (hereinafter, the "**Governor's Order**").

D.    In determining whether a business is a Life-Sustaining Business, the business should first refer to the Governor's Order and the list of Life-Sustaining Businesses. That list has been updated by the Commonwealth to conform with guidance on Essential Critical Infrastructure issued by the Department of Homeland Security, Cybersecurity and Infrastructure Security Agency. The City's Order should be interpreted to be consistent with the Governor's Order.

E.    The City of Philadelphia shall provide Philadelphia-specific definitions and examples of Life-Sustaining Businesses, which are defined as Essential Businesses and Activities below, in appropriate coordination with the Commonwealth. The City's Order may impose additional public health and safety restrictions above and beyond the Governor's Order.

F.    **Essential Retail Businesses and Activities**, includes the following:

1. "Grocery Stores,"[1] including supermarkets, farmers' markets, convenience stores, and mini-markets; these stores should discourage non-shopping activity (leisure or idling) and manage store occupancy to allow for social distancing

2. "Food Services," or restaurants limited to providing delivery service or pre-ordering online or via phone (strictly prohibited are walk-in ordering, dine-in service, and mobile food vendors, such as food trucks)

3. "Automotive Parts, Accessories, and Tire Stores," including auto-repair shops but not any affiliated car dealerships

4. "Gasoline Stations," including their convenience stores

5. "Building Material and Supplies Dealers," including hardware stores, but not lawn and garden stores

6. "Electronic Shopping and Mail-Order Houses," means establishments primarily engaged in retailing all types of merchandise using non-store means, such as catalogs, toll free telephone numbers, or electronic media

7. "Other General Merchandise Stores," except department stores, includes:

    i.  Hardware stores supplying life-sustaining electrical, plumbing, heating, automotive parts, and other life-sustaining materials

---

[1]    Terms appearing in quotations are identified as a Sector, Subsector, or Industry Group in the Governor's Order.

      ii. Pharmacies, drug stores, and retailers of prescription or nonprescription drugs, medicines, and essential healthcare products

8. "Personal Household Goods Repair and Maintenance," includes:

      i. Emergency or urgent household repairs (HVAC, plumbing, electrical, utilities, life-sustaining household appliances, telecommunications equipment) and repair and maintenance necessary to maintaining the safety, sanitation, and essential operation of home residences

      ii. Bicycle or motorcycle repair shops

      iii. Stores primarily engaged in repairing cell phones

9. "Home Healthcare Services," includes in-home or home-based care for seniors, adults, or children (not to be confused with child daycare facilities)

10. "Postal Service" and "Couriers and Messengers," includes post offices, local messengers and local delivery, shipping and freight services, package delivery companies that deliver packages to residential buildings and offices, and companies that otherwise provide intercity, local, and/or international delivery of parcels and documents (including express delivery services)

11. "Dry-cleaning and Laundry Services," includes laundromats

12. Consumer banks and credit unions using drive-through, ATM, and limited lobby services, which are permissible "Financial Activities"

13. Veterinary hospitals and services, and pet stores (which are "Other Miscellaneous Stores")

14. "Rooming and Boarding Houses" includes hotels

15. "Clothing Stores" that only or primarily sell essential uniforms and apparel for medical/healthcare professionals and public safety workers (police officers and firefighters)

16. "Automotive Equipment Rental and Leasing," includes establishments primarily engaged in renting or leasing passenger cars and trucks

17. "Services to Buildings and Dwellings," includes establishments primarily engaged in exterminating and controlling birds, mosquitoes, rodents, termites, and other insects and pests

G. **Essential Infrastructure and Industrial Businesses and Activities:**

1. "Construction" for:

      i. All medical, pharmaceutical, and healthcare facilities (including non-emergency construction)

      ii. All emergency projects or other projects deemed essential by the City of Philadelphia, while appropriately balancing public safety, to ensure the

4

continued delivery of critical infrastructure services and functions by the City ("City Essential Infrastructure Projects")

    iii. Emergency repairs for "Residential Building Construction," "Nonresidential Building Construction," "Utility Subsystem Construction" (related buildings and structures for utilities, *i.e.*, water, sewer, petroleum, gas, power, and communication, and all structures that are integral parts of utility systems); "Highway, Street, and Bridge Construction," "Other Heavy and Civil Engineering Construction," "Foundation, Structure, and Building Exterior Contractors," Building Equipment Contractors," "Building Finishing Contractors," and "Other Specialty Trade Contractors"

2.   "Transit and Ground Passenger Transportation," which includes urban transit systems, taxi and limousine services, interurban and rural bus transportation, other transit and group passenger transportation (except Charter Bus Industry), and rideshare services (*see* Governor's Order for other categories)

3.   "Air, Rail, Water, Truck Transportation," and affiliated "Support Activities," which includes delivery and distribution services, and Philadelphia ports and port-related functions (*see* Governor's Order for other categories)

4.   "Waste Management and Remediation Services," which includes trash collection and essential sanitation or cleaning of public right of ways (*e.g.*, sidewalks and streets) (*see* Governor's Order for other categories)

5.   "Broadcasting," which includes radio and television broadcasting, and cable and other subscription programing (*see* Governor's Order for other categories)

6.   "Publishing industries," which includes newspapers, periodicals, books, magazines, and directory publishers (*see* Governor's Order for other categories)

7.   "Telecommunications" (except telecommunications resellers), which includes wireless telecommunications carriers (*see* Governor's Order for other categories)

8.   "Manufacturing," which includes all manufacturing of: food and beverages; medical supplies and equipment; HVAC equipment; plastics, rubber, cement/concrete, iron, steel, ferroalloy, and aluminum; semiconductor, electrical electromedical, navigational, control instrument components and products (*see* Governor's Order for other categories)

    i. "Pharmaceutical and Medicine Manufacturing" is defined to include all essential activities and support activities related to ensuring the availability of in-vivo diagnostic substances and pharmaceutical preparations intended for internal and external consumption in dose forms, such as ampoules, tablets, capsules, vials, ointments, powders, solutions, and suspensions, as well as biological products, such as vaccines, toxoids, blood fractions, and culture media of plant or animal origin

    ii. The prohibition on "Apparel Manufacturing" in the Governor's Order does not apply to the manufacturing or sale of essential uniforms and apparel for medical and healthcare professionals and public safety officers (*e.g.*, police officers and firefighters)

5

9. "Wholesale Trade," which includes all wholesale trade of: food, groceries, and related products; pharmaceutical medical, healthcare, and wellness products; medical supplies and equipment; life-sustaining public health products; and all permissible Retail Trade products under the Governor's Order (*see* Governor's Order for other categories)

10. "Professional Businesses and Services," which includes:

    i. "Scientific Research and Development Services," *e.g.*, all essential research and development and support activity relating to Pharmaceutical and Medicine Manufacturing and biotechnology activity (*see* Governor's Order for other categories)

    ii. *See* Section 3.C. regarding "Legal Services"

H. **Essential Healthcare and Social Services Businesses and Activities** include:

1. All medical or healthcare related services and support services, including "Hospitals"; "Nursing and Residential Care Facilities"; "Ambulatory Health Care Services" (offices of physicians, dentists, and other health practitioners); urgent care facilities; and mental and behavioral health providers

2. "Social Assistance" includes businesses that provide essential food, shelter, and critical social services for economically disadvantaged or otherwise needy individuals are not prohibited from providing essential food, shelter, and services; and residential facilities and shelters for seniors, adults, and children

I. **Essential Governmental Functions** includes all services needed to ensure the continuing operation of the government agencies and provide for the health, safety and welfare of the public, including City Essential Infrastructure Projects.

J. **Essential Educational Functions** include:

1. Elementary and secondary schools maintaining preparation and distribution of meals for children (with essential staff only)

2. Colleges and universities supporting residence halls where students must reside (with essential staff only)

Additional Essential Businesses may be determined by the Department of Public Health, consistent with the Governor's Order, and shall be identified at phila.gov/COVID-19.

**Section 2.    Prohibition on Operation of Office-Based Businesses**

A. No office-based or co-working space business or organization, other than an Essential Business, may operate the business generally with personnel located in such office.

B. Businesses required to suspend physical operations may only have essential on-site personnel to maintain critical functions, such as security, processing of essential operations (*e.g.*, payroll and benefits for employees; maintaining remote technology infrastructure; and facilitating "Facilities Support Services" permitted by the Governor's Order, which are services such as

janitorial, maintenance, trash disposal, guard and security, mail routing, and reception). Businesses are also permitted to maintain essential on-site personnel to ensure compliance with federal, state and local regulatory requirements, and for the safety and security of essential government services. All businesses must follow social distancing and COVID-19 mitigation guidance provided by the U.S. Center for Disease Control, the Pennsylvania Department of Health, and the Philadelphia Department of Public Health. The business and activities described in this section are "**Essential Minimum Basic Operations**."

**Section 3.      Other Non-Essential Businesses and Activities**

A.      Businesses that are not listed as Essential Businesses or Life-Sustaining by the Commonwealth are non-essential businesses. For the avoidance of doubt, non-essential retail businesses that cannot operate include, among other things, movie theaters, clothing-only stores, fitness clubs (yoga, barre, and spin facilities), personal care salons (hair salons, barbershops, and nail salons), arts and music venues, tour operators, social clubs, night clubs, bars, electronic and appliance stores, amusement facilities, food trucks, ice cream trucks, car dealerships, florists, office supply stores, stationery stores, book stores, furniture stores, gift stores, event halls, and shopping malls.

B.      Child daycare facilities are non-essential businesses, unless they obtain a waiver to operate from the Commonwealth of Pennsylvania or the City of Philadelphia.

C.      "Legal Services," specifically the practice of law, is governed by the rules established by the Supreme Court of Pennsylvania and/or the Administrative Office of Pennsylvania Courts. Restricted access to law offices and facilities by legal professionals, staff, and clients is permitted to the degree necessary to allow attorneys to participate in court functions deemed essential by a president judge per the Supreme Court's order of March 18, 2020 or orders of the courts of the United States, so long as social distancing and other mitigation measures are employed for the protection of lawyers, staff, and clients. Pursuant to the Governor's Order, all other business must be conducted remotely; necessary retrieval of files or other materials should be accomplished expeditiously.

D.      Operators of non-life sustaining, non-emergency construction in Philadelphia shall have until 5:00 p.m. on March 27, 2020, to make construction sites safe and secure. Contractors are directed to take proper measures to protect adjacent properties, remove or fasten items that are or could become loose, secure sites against trespass, and complete work necessary to protect and ensure the structural integrity of buildings under construction. Occupied residential properties must be left in safe and habitable condition.

E.      No storefront businesses may open or operate their storefronts unless they are Essential Businesses.

**Section 4.      Social Distancing Rules**

A.      Any business operating under and during the term of this Order must adhere to Social Distancing Rules, which include making efforts to maintain at least six (6) feet of space between individuals; frequently washing hands with soap and running water for at least twenty (20) seconds

and/or using hand sanitizer, refraining from shaking hands; covering coughs or sneezes with a sleeve or elbow (not hands); and regularly cleaning frequently touched surfaces, such as desks, tables, countertops, computers, phones, and door handles.

B.    Businesses permitted to perform emergency household maintenance and repair services under this Order must: require the customer to clean and sanitize the work are prior to arrival; sanitize the work area themselves before and after completing the work; ask that occupants keep a personal distance of 10-feet at a minimum during work;  and allow in the residence only the number of workers necessary to complete the emergency maintenance or repair.

### Section 5.    Gatherings of Individuals

All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Emergency Order.  This does not apply to activities related to Essential Businesses and Activities or Essential Personal Activities, which must observe the requirements under 4.A.

### Section 6.    Stay at Home Order

A.    All Philadelphia residents shall remain home or at their place of residence unless they are engaged in **Essential Personal Activities**, which include:

1. obtaining essential goods or services from Essential Businesses, such as obtaining pre-ordered takeout food or beverages from restaurants, acquiring groceries, obtaining medical prescriptions or supplies, or any other products from Essential Businesses for themselves, family, household members, and pets

2. seeking any form of medical attention, including through Essential Healthcare and Social Services Businesses and Activities, or seeking assistance from law enforcement or emergency services for themselves, family, household members, and pets

3. caring for family members, friends, or a pet in another household, including delivering essential goods or obtaining emergency services and attention

4. reporting to, or performing, their job related to Essential Business, Essential Minimum Operations, or Essential Government Function

5. walking, running, cycling, operating a wheelchair, or engaging in outdoor activities with immediate family members, caretakers, household members, or romantic partners while following Social Distancing Rules with other individuals, which includes staying six feet apart

6. leaving the home for an educational, religious, or political reason

8

7.  leaving because of a reasonable fear for health or safety

8.  leaving at the direction of law enforcement or other government agency

9.  engaging in any other activities or performing tasks essential to health and safety, or to the health and safety of themselves, family, household members, or pets

B.  Individuals experiencing homelessness are exempt from this directive, but are strongly urged to obtain shelter, and City agencies and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable(and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Center for Disease Control, the Pennsylvania Department of Health, and the Philadelphia Department of Public Health). Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location.

**Section 7.    Exemptions from the Governor's Order**

A.  In extenuating circumstances, special exemptions to the Governor's Order will be granted by the Commonwealth.  Businesses seeking a waiver should comply with the Governor's Order and suspend in-person, physical operations until a waiver is approved and provided.

B.  Businesses performing Essential Governmental Functions, including essential Construction for the City of Philadelphia need not obtain an exemption from the Commonwealth.

9

**Section 8.**      **Effective Date and Duration**

This Order shall supersede the Emergency Order issued by the Health Commissioner dated March 12, 2020, which forbade mass gatherings, and the Emergency Order issued by the Mayor and Health Commissioner dated March 17, 2020, which prohibited operation of non-essential businesses.  This Order shall become effective as of **Monday, March 23 at 8:00 AM**, and shall remain in effect indefinitely, until rescinded, superseded, or amended by further Order.  Failure to comply with this Order shall result in orders to cease operations and the imposition of such other remedies and penalties as provided for by law.

Date:  March 22, 2020

_____
James F. Kenney, Mayor
City of Philadelphia

_____
Thomas A. Farley, MD, MPH
Health Commissioner
City of Philadelphia

10

# EXHIBIT 4



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*ORDER OF*

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA*

*FOR INDIVIDUALS TO STAY AT HOME*

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

*Section 1: Order to Stay at Home*

*All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County are ordered to stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services. For employees of life sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020 business closure Orders.*

*A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.*

*Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.*

*Enforcement of this Order will commence at 8:00 PM on Monday, March 23, 2020.*

*Section 2: Effective Date and Duration*

*This order is effective immediately and will remain in effect for a period of two weeks, specifically until April 6, 2020.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this twenty-third day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*

# EXHIBIT 5



# Order of the Secretary of the Pennsylvania Department of Health to Stay at Home

To protect the public from the spread of Coronavirus (COVID-19), it is necessary that all individuals residing in the counties of Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia to stay at home or at their place of residence except as needed to access, support or provide life sustaining business, emergency or government services. Therefore, on this day, March 23, 2020, under the authority granted to me by law, I hereby order:

All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County to stay at home except as needed to access, support or provide life-sustaining business, emergency or government services.  For employees of life-sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020 business closure Orders. A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this order.

Individuals leaving their home or place of residence to access, support or provide life sustaining services for themselves, another person or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities, however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining business, emergency or government services as outlined above.

Enforcement of this Order will commence at 8:00 PM on Monday, March 23, 2020.

COVID-19 is a contagious disease that is rapidly spreading from person-to-person. People infected are capable of exposing others to COVID-19 even if their symptoms are mild, such as a cough.  Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes.  Spread by persons who are asymptomatic has not been ruled out.

Multiple areas of the United States are experiencing "community spread" of COVID-19, which means that the illness is being transmitted through unknown sources, not from known areas of infection.  Mass gatherings increase the risk of transmission and

community spread. Case counts of COVID-19 are rapidly increasing throughout many Pennsylvania counties, and are anticipated to continue to appear throughout the Commonwealth.

Symptoms of COVID-19 may include fever, cough, and shortness of breath. Older adults and people who have serious chronic medical conditions are at a higher risk for serious illness. Early symptoms may also include chills, body aches, sore throat, headache, diarrhea, nausea/vomiting, and runny nose.

On March 6, 2020, the Governor issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. Since the Commonwealth of Pennsylvania confirmed its first case of COVID-19, positive cases continue to rise. As of March 22, 2020, the Commonwealth of Pennsylvania has 479 positive cases of COVID-19 and reports two deaths from the virus.

On March 19, 2020, the Governor and Secretary of Health issued Orders directing the closure of non-life sustaining businesses. Operation of non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19. Similarly, the directive for individuals to stay at home will facilitate the mitigation of COVID-19 by decreasing the opportunities for the transmission of the virus and decrease the risk of community spread.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* Section 5 of the Disease Prevention and Control Law, 35 P.S. §§ 521.1; 521.5, sections 2102(a) and 2106 of the Administrative Code of 1929, 71 P.S. § 532(a) and 536 and the Department of Health's (Department) regulations found at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine). Particularly, the Department has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. §§ 521.5; 71 P.S. § 532(a), and 1402(a); 28 Pa. Code § 28.60. The Department determines that the appropriate disease control measure based upon COVID-19, the manner of its spread in the Commonwealth and in the world, and its danger to Pennsylvanians, is for individuals residing in the Commonwealth to stay at home except to obtain life-sustaining services for themselves or others as outlined in this order to prevent and control the spread of disease.

Accordingly, the order and directive for individuals residing in the Commonwealth to stay at home is necessary to protect the public's health.  This Order shall take effect immediately and remain in full force and effect for a period of two weeks, specifically until April 6, 2020.

_____

Rachel Levine, MD
Secretary of Health

# EXHIBIT 6

# UTICA FIRST
### INSURANCE COMPANY

March 27, 2020

CERTIFIED #9214 8901 0661 5400 0150 0776 75

KITE & KEY; KITE AND KEY
GASTRO PUB INC DBA

 

RE:    Our Insured:    KITE & KEY; KITE AND KEY
        Policy #:        BOP 4464499
        Claim #:        573202
        Claimant:      KITE & KEY; KITE AND KEY
        Date of Loss:  3/16/2020

Dear Insured,

Utica First Insurance Company acknowledges notice of a claim occurring at 1836 Callowhill Street, Philadelphia, PA for loss of income due to the Covid19 virus and closure of your business due to government mandate relating to the virus.

After reviewing your policy and the circumstances involved, we are unable to provide coverage to you for this loss.

Please refer to page 19 through 21 of your policy form BP 0200 (ed 06-12).

## COVERAGE C -- LOSS OF INCOME

*"We" provide the Loss of Income coverages described below during the "restoration period" when "your" business sustains a necessary "interruption" resulting from direct physical loss or damage to real or personal property as a result of a covered peril.*

## LOSS OF INCOME COVERAGE EXTENSIONS

*"We" provide the following Loss of Income Coverage Extensions. These Loss of Income Coverage Extensions are part of and not in addition to the applicable Loss of Income coverage "limit".*

3.   *Interruption By Civil Authority -- "We" extend "your" coverage to include loss while access to the described premises is specifically denied by an order of civil authority.*

This order must be a result of damage to property other than at the described premises that is caused by a covered peril, subject to the following:

a.  the described premises is:

   1)  within one mile of the damaged property; and
   2)  within the area where access is denied by civil authority; and

b.  the order is initiated:

   1)  to allow civil authority to have access to the damaged property without interference; or
   2)  due to dangerous conditions as a result of the damage or continuation of the covered peril that caused the damage.

Please refer to page 23 of your policy form BP 0200 (ed 06-12).

---

## PERILS EXCLUDED

---

"We" do not pay for loss or damage if one or more of the following exclusions apply to the loss or damage, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

1.  **Civil Authority** -- "We" do not pay for loss or damage caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

7.  **Virus Or Bacteria** -- "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

   This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

   a.  any contamination by any virus, bacterium, or other microorganism; or

   b.  any denial of access to property because of any virus, bacterium, or other microorganism.

   This exclusion does not apply to loss, cost, or expense resulting from "fungus or related perils".

   This exclusion supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

Based on the above, your insurance policy does not provide coverage for this type of loss.

If you have further information regarding this matter, it should be referred to us immediately. Utica First Insurance Company reserves its rights to invoke any additional policy provisions, which may be unknown or inapplicable at this time, but which may become known or applicable in the future.

Sincerely,

Garret Woodward
Sr. Claims Examiner
(315) 736-8211 Ext: 3214

CC:

PROGRESS BROKERAGE GROUP LLC
920 WEST SPROUL ROAD, STE 201
SPRINGFIELD, PA 19064