**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KITE AND KEY GASTRO PUB, INC.** | ) | **CIVIL ACTION** |
| **d/b/a Kite & Key, individually and on** | ) | |
| **behalf of all others similarly situated,** | ) | **NO. 2:20-CV-4264-MMB** |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **UTICA FIRST INSURANCE** | ) | |
| **COMPANY,** | ) | |
| **Defendant** | ) | |

**DEFENDANT UTICA FIRST INSURANCE COMPANY'S BRIEF IN
SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

**POST & SCHELL, P.C.**

**BY:**   **/s/  Steven J. Schildt**
**STEVEN J. SCHILDT, ESQ.**
**I.D. # 79011**
**BRYAN M. SHAY, ESQ.**
**I.D. # 205953**
Attorneys for Defendant
1600 JFK Blvd., 13th Floor
Philadelphia, PA 19103
Phone: 215-587-1089
E-mail: sschildt@postschell.com

**DATE:  10/21/20**

**Table of Contents**

Page

I.    SUMMARY OF THE ARGUMENT ................................................................1

II.   FACTUAL BACKGROUND ........................................................................2

    A.   RELEVANT TERMS OF THE POLICY ................................................2

    B.   PLAINTIFF'S CLAIMS ........................................................................7

III.  QUESTION PRESENTED ...........................................................................10

IV.   APPLICABLE LEGAL STANDARDS ......................................................10

    A.   MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)................10

    B.   INTERPRETATION OF INSURANCE POLICIES ............................11

V.    ARGUMENT ................................................................................................15

    A.   THE VIRUS EXCLUSION BARS PLAINTIFF'S CLAIM ................15

    B.   THE POLICY'S "CIVIL AUTHORITY" COVERAGE DOES
       NOT APPLY ...........................................................................................21

    C.   PLAINTIFF'S COMPLAINT FAILS TO ALLEGE PHYSICAL
       LOSS OF, OR DAMAGE TO, ITS OWN PROPERTY OR
       PROPERTY NEARBY ..........................................................................25

    D.   COURTS AROUND THE COUNTRY HAVE REJECTED
       CLAIMS LIKE THOSE MADE BY PLAINTIFF ..............................27

VI.   CONCLUSION .............................................................................................28

Defendant Utica First Insurance Company ("Utica First") hereby respectfully submits this Brief in support of its Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.      SUMMARY OF THE ARGUMENT

This lawsuit arises out of a claim by Plaintiff for coverage under a policy of Businessowners Insurance issued to Plaintiff by Utica First (the "Policy"). Specifically, Plaintiff—which owns, operates, manages, and/or controls the Kite & Key Pub in Philadelphia, Pennsylvania—seeks coverage under the Policy for a loss of business income that it allegedly suffered as a result of the Novel Coronavirus Disease of 2019 ("COVID-19") and, in particular, the various restrictions and orders issued by state and local authorities in an effort to contain the spread of COVID-19.  According to Plaintiff's Complaint, these orders prevented Plaintiff from having indoor dining for a period of time, thus causing it to lose income that it otherwise would have received in the absence of these orders.

Simply put, the Policy does not cover the losses (here, purely economic) allegedly suffered by Plaintiff as a result of COVID-19, including those allegedly resulting from the governmental efforts to contain the spread of this virus. Although there are a number of reasons for reaching this conclusion, including (among others) that there is no physical loss or damage that triggers coverage under the Policy in the first instance, the fact that Plaintiff's loss—whether couched in terms of a civil authority loss or otherwise—relates to and/or only exists **because of the COVID-19 virus** means that coverage for this loss is clearly, unambiguously, and entirely excluded pursuant to the "Virus Or Bacteria" exclusion contained in the Policy. Utica First's Motion should therefore be granted, and the Complaint against it should be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6).

## II.    FACTUAL BACKGROUND

### A.    RELEVANT TERMS OF THE POLICY

Utica First issued the Policy—which bears Utica First policy number BOP 4464499 00—to Plaintiff for the Policy period of June 26, 2019 to June 26, 2020.[1] *See* Ex. A at POL002.[2] The named insured on the Policy is "Kite and Key Gastro Pub Inc. DBA Kite & Key," and the named insured's address is listed as 920 W. Sproul Road, Springfield, Pennsylvania 19064. *Id.* The Policy contains, *inter alia*, coverage for "Loss of Income"; this coverage has a policy limit that is defined as "actual loss." *Id.*

Relevant to Plaintiff's claims, the Policy's coverage for "Loss of Income" is provided by Policy form number BP 0200 (06/12), as amended by Policy form number BP 0816 (01/15). As set forth therein, the coverage for "Loss of Income" is as follows:

> "We" provide the Loss of Income coverages described below during the "restoration period" when "your" business sustains a necessary "interruption" resulting from direct physical loss or damage to real or personal property as a result of a covered peril.
>
> **Restrictions –**
>
> a.    With respect to the Loss of Income coverages, a covered peril does not include a peril that applies only to "computers".
>
> b.    The Loss of Income coverages apply only when the loss or damage to real or personal property occurs at the described premises or in the open (or in vehicles) within 100 feet of the described premises.

---

[1] A copy of the Policy was not attached to Plaintiff's Complaint. However, Plaintiff's claims are expressly based on the terms of the Policy, and these terms are invoked throughout the Complaint. Accordingly, the Court may consider the Policy—which is attached to Utica First's Motion—without converting the instant Motion to a Motion for Summary Judgment. *See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Borough of Moosic v. Darwin Nat. Assur. Co.*, 556 Fed. App'x 92, 95 (3d Cir. 2014); *Warren General Hosp. v. Amgen, Inc.*, 643 F.3d 77, 88 (3d Cir. 2011).

[2] References to the pages of the Policy are to the Bates-stamps applied to Exhibit A.

2

When "you" occupy only a portion of a building, "your" described premises is the portion of the building "you" rent, lease, or occupy and any area of the building or described premises that provides services or access to "your" described premises. With respect to personal property in the open (or in vehicles), "your" described premises also includes the area within 100 feet of the building.

c.   Except as provided under Additional Loss Of Income Coverages for Destruction Of Data Records And Programs, "we" will not pay for "your" loss of Earnings or Extra Expenses resulting from damage, loss, corruption, or destruction of "data records", "programs and applications", or "proprietary programs".

d.   "We" pay only the loss of earnings and extra expenses incurred within 12 consecutive months after the date of direct physical loss or damage to property.

**Coverage Limit** – When a "limit" of insurance for Coverage C – Loss Of Income is shown on the "declarations", "we" do not pay more for earnings and extra expenses combined than the Coverage C – Loss Of Income "limit".

*Id*. at POL094; *id*. at POL048.

Under "Perils Covered" the Policy specifically provides that it covers "direct physical loss or damage unless the loss is limited or caused by a peril that is excluded." *Id*. at POL049. The Policy contains several Excluded Perils, including a "Civil Authority" exclusion, which provides as follows:

1.   **Civil Authority** – "We" do not pay for loss or damage caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

However, "we" do pay for loss or damage resulting from acts of destruction by the civil authority to prevent the spread of fire, unless the fire is caused by a peril excluded under this policy.

*Id*. at POL098. In addition, the Policy also specifically provides that "Virus Or Bacteria" is an "Excluded Peril":

> 7. **Virus Or Bacteria –** "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness or physical distress.
>
> This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:
>
> a. any contamination by any virus, bacterium, or other microorganism; or
>
> b. any denial of access to property because of any virus, bacterium, or other microorganism.
>
> This exclusion does not apply to loss, cost, or expense resulting from "fungus or related perils".
>
> This exclusion supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

*Id*. at POL100 (the "Virus Exclusion"). Importantly, the Policy states as follows with regard to the operation of these exclusions:

> "We" do not pay for loss or damage if one or more of the following exclusions apply to the loss or damage, **regardless of other causes or events that contribute to or aggravate the loss**, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

*Id*. at POL098 (bold added).[3]

---

[3] In addition to the foregoing, which are applicable generally, the coverage for "Loss of Income" contains several additional exclusions that are specific to that coverage. However, none of these exclusions is applicable to this case.

In addition to the term "Perils Covered," the Policy defines the following terms that are used in the "Loss of Income" coverage:

7.      "Interruption" means:

    a.      the reduction or complete stoppage of "your" business activities; or

    b.      all or part of the described premises becomes unfit for rental occupancy.

*    *    *

9.      "Restoration period" means the time it should reasonably take to resume "your" normal business activities at the described premises.

**Time Limitations and Restrictions - -**

    a.      The "restoration period" begins:

        1)      with respect to Earnings, 72 hours after the time of direct physical loss or damage caused by a covered peril; and

        2)      with respect to Extra Expense, immediately after the time of direct physical loss or damage caused by a covered peril.

    b.      The "restoration period" ends on the earlier of:

        1)      the date that the property should be rebuilt, repaired, or replaced with reasonable speed and similar quality; or

        2)      the date when the business is resumed at a new permanent location.

    The length of the "restoration period" is not limited by the expiration date of the policy.

    c.      The "restoration period" does not include any increase in time due to the enforcement of any code, ordinance, law, or decree that regulates or requires:

        1)      the construction, use, repair, or demolition of any property; or

5

> 2) that "you" or anyone else test for, abate, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "pollutants" or "fungus or related perils".

*Id*. at POL080-81.

Although the Policy generally excludes all loss or damage resulting from "Civil Authority," when it comes to loss of income, the Policy provides for "Interruption By Civil Authority" coverage, but **only** under certain specific and limited circumstances not applicable here. To this end, the Policy states, in relevant part, as follows:

> 3. **Interruption by Civil Authority –** "We" extend "your" coverage to include loss while access to the described premises is specifically denied by an order of civil authority.
>
> This order must be a result of damage to property other than at the described premises that is caused by a covered peril, subject to the following:
>
> a.  the described premises is:
>
>> 1) within one mile of the damaged property; and
>>
>> 2) within the area where access is denied by civil authority; and
>
> b.  the order is initiated:
>
>> 1) to allow civil authority to have access to the damaged property without interference; or
>>
>> 2) due to dangerous conditions as a result of the damage or continuation of the covered peril that caused the damage.
>
> **Waiting Period And Time Limitation- -**
>
> This coverage for Earnings will begin 72 hours after the time of the initial order of civil authority that denies access to the described premises and will apply for a period of up

to four consecutive weeks from the date this coverage began.

This coverage for necessary Extra Expenses begins at the time of the initial order of civil authority that denies access to the described premises and will end:

a.     four consecutive weeks after the date of the initial order; or

b.     when this coverage for Earnings expires;

whichever is later.

*Id.* at POL096.

### B.     PLAINTIFF'S CLAIMS

According to Plaintiff's Complaint, Plaintiff "owns, operates, manages, and/or controls the 'Kite & Key'—a hybrid pub, bar, and restaurant that serves food and alcohol at 1836 Callowhill Street[,] Philadelphia, PA 19130." Compl., ECF Doc. No. 1, at ¶ 2. Plaintiff alleges that in light of COVID-19, "various state and local authorities prohibited Plaintiff and similar establishments from offering in-store dining, regardless of any evidence of actual contamination of the premises." *Id.* at ¶ 3. Plaintiff alleges that its business as a restaurant was not considered "essential," and therefore was subject to "closure orders" by state and local authorities. *Id.* at ¶¶ 4-5. Plaintiff further alleges that it closed its premises on March 16, 2020, in accordance with these orders, and that it "has been prohibited from reopening at its intended capacity." *Id.* at ¶ 6. Plaintiff claims that it has sustained income loss, which it alleges is due to its compliance with the directives of state and local authorities; it therefore sought coverage under the Policy for this lost income. *Id.* at ¶¶ 7-12.

Plaintiff avers that prior to March 16, 2020, it was open for business seven days per week from 11:00 a.m. to 2:00 a.m., and that its facility had a capacity of 150 patrons. *Id.* at ¶ 20. However, as the COVID-19 pandemic began to take hold in the United States, Pennsylvania's

Governor Thomas Wolf issued a "Proclamation of Disaster Emergency." *Id*. at ¶¶ 37, 39. A similar emergency declaration was issued by the City of Philadelphia on March 12, 2020; this order prohibited mass gatherings within the city. *Id*. at ¶ 41. According to the Complaint, Governor Wolf's subsequent order of March 16, 2020 required restaurants and bars in Pennsylvania to close their dine-in facilities; only carryout, delivery, and drive-through services were permitted. *Id*. at ¶ 42. Orders closing non-essential business within Philadelphia and throughout Pennsylvania were subsequently issued by the Mayor of Philadelphia and the Governor, respectively. *Id*. at ¶¶ 43-44. These orders "continued the dine-in prohibition for restaurants and bars." *Id*. at ¶ 45. Although the City of Philadelphia's order of March 22, 2020 temporarily prohibited the operation of "non-essential businesses" within the City of Philadelphia, that order expressly noted that "Food Services" was an "Essential Retail Business[] and Activit[y]," and that such establishments—which would include Plaintiff—could continue to operate for delivery service or pre-ordering—by telephone or online only—during term of the emergency order. *See id*. at ¶ 46; *see also id*., Ex. 3, at 3. The Governor issued subsequent stay-at-home orders for Pennsylvania residents on March 23, 2020 and April 1, 2020. Compl., ECF Doc. No. 1, at ¶¶ 47-49. Despite the express statements within these orders, Plaintiff alleges that the various "Civil Authority Orders" referenced in its Complaint demonstrated "an awareness on the part of both state and local governments that COVID-19 causes damage to property." *Id*. at ¶ 50.

In terms of the impact of these "Civil Authority Orders" on Plaintiff's business, Plaintiff alleges that Plaintiff "closed" its business on March 16, 2020, but that it in fact remained open—beginning on March 18, 2020—for "take-out service, until being allowed to partially re-open with restricted outdoor seating, in compliance with social distancing and sanitation procedures,

on June 12, 2020." *Id.* at ¶¶ 55-56. Plaintiff alleges that as a result of the restrictions on indoor dining, it was forced to furlough 26 employees, and that it suffered a loss of business income. *Id.* at ¶¶ 58-59. Despite having previously stated that there is no evidence of infection or contamination on its premises, Plaintiff nevertheless claims—without any evidence—that COVID-19 damaged Plaintiff's property; according to Plaintiff, "it is a physical substance, which lives on and is active on inert physical surfaces, that attached to and deprived Plaintiff of its property, resulting in direct physical loss." *Id.* at ¶ 60.

Plaintiff claims that it is entitled to coverage for these alleged business income losses because the Policy is an "all-risk policy" that "provides for coverage for 'loss of income' whether the loss or damage to property occurs on Plaintiff's premises or not." *Id.* at ¶¶ 21-31. According to Plaintiff's Complaint, the "Civil Authority Orders" constituted a "covered cause of loss" under the Policy, and/or that the "ubiquitous nature of the COVID-19 virus caused a direct physical loss of or damage to Plaintiff's Covered Property." *Id.* at ¶¶ 65-68. Plaintiff therefore made a claim to Utica First for coverage under the Policy with regard to its alleged loss of business income. *Id.* at ¶ 70. By letter dated March 27, 2020, Utica First denied coverage for Plaintiff's claim based on both the Virus and Civil Authority Exclusions. *Id.* at ¶ 71. Plaintiff alleges that these exclusions are not applicable. *Id.* at ¶¶ 72-73.

Plaintiff—on behalf of itself and a putative class of Utica First's policyholders that were allegedly denied coverage for business income losses due to the COVID-19 pandemic—asserts two claims against Utica First: a claim for breach of contract (Count I), and a claim for a declaratory judgment pursuant to 28 U.S.C. §§ 2201, *et seq.* (Count II).  *Id.* at ¶¶ 99-112. Notably, both claims seek the same relief: a determination that Plaintiff's alleged business losses arising from the governmental closure orders and the COVID-19 virus are covered under the

Policy; and an award of monetary damages. *See id.* at ¶¶ 102, 105, 112; *see also id.* at Part VI

("Claim for Relief").

## III.   QUESTION PRESENTED

Whether Plaintiff's claim seeking coverage for its alleged loss of business income due to the state and local governmental restrictions imposed in light of the COVID-19 pandemic should be dismissed, where it is clear from the face of the Complaint—and the documents attached thereto and referenced therein—that (1) Plaintiff's alleged loss of business income was the result of a virus; (2) Plaintiff's alleged loss of business income was not caused by a "covered peril"; (3) Plaintiff was not prohibited from accessing its premises by an order of a civil authority; and (4) Plaintiff's Complaint does not allege direct physical loss or damage so as to trigger coverage under the Policy in the first instance.

> **SUGGESTED ANSWER:  Yes. There is no coverage available under the Policy for loss of income not occasioned by "direct physical loss or damage" and, even if there was, coverage is otherwise wholly excluded under and by virtue of both the Civil Authority and Virus Exclusions contained within the Policy.**

## IV.   APPLICABLE LEGAL STANDARDS

### A.   MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for the dismissal

of a cause of action where the complaint fails to state a claim upon which relief can be granted.

*See* Fed. R. Civ. P. 12(b)(6).  In order to survive a motion to dismiss made pursuant to Fed. R.

Civ. P. 12(b)(6), the allegations of a complaint must set forth "'sufficient factual matter' to show

that the claim is facially plausible."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir.

2009).  These factual allegations must "raise a reasonable expectation that discovery will reveal

evidence of the necessary elements" of a cognizable legal claim.  Fed. R. Civ. P. 8(a)(2); *Fowler*,

578 F.3d at 210 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also*

*Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008).

Accordingly, complaints must set forth more than "threadbare, conclusory allegations"

and must contain a factual basis for the claims raised therein.  *See, e.g., Cobb v. State Farm Ins.*

*Cos.*, 2012 U.S. Dist. LEXIS 55651, at *4 (E.D. Pa. Apr. 20, 2012).  As the Supreme Court has opined, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also id*. at 677-78 (noting that mere "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim for relief).

Consistent with these principles, this Court must undertake the following three-part inquiry when determining whether Plaintiffs have carried their pleading burden under *Twombly* and *Iqbal*: (1) identify the elements of Plaintiffs' claims; (2) review the Complaint to strike conclusory allegations; and then (3) look at the well-pleaded **factual** components of the Complaint and evaluate whether all of the elements identified in part one of the inquiry are sufficiently alleged and supported.  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Fowler*, 578 F.3d at 210-11.

## B.    INTERPRETATION OF INSURANCE POLICIES

Under Pennsylvania law,[4] the interpretation of an insurance contract is a question of law to be performed by the Court.  *See, e.g., Nationwide Mut. Fire Ins. Co. v. Nova Real Estate LLC*, 2011 U.S. Dist. LEXIS 20601, at *11 (E.D. Pa. Mar. 1, 2011); *Continental Cas. Co. v. Pro Machine*, 916 A.2d 1111, 1118 (Pa. Super. 2006).  As the Third Circuit has explained:

> **"The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury.** The goal of that task is, of course, to ascertain the

---

[4] The Policy was issued to a Pennsylvania entity at a Pennsylvania address, and it contains Pennsylvania-specific endorsements. Accordingly, Utica First respectfully submits that Pennsylvania law controls the interpretation of the Policy's terms. *See, e.g., Wilson v. Hartford Cas. Co.*, 2020 U.S. Dist. LEXIS 179896, at *16 n.3 (E.D. Pa. Sept. 30, 2020) (applying Pennsylvania law pursuant to the choice of law rules discussed in *Hammersmith v. TIG Insurance Company*, 480 F.3d 220, 228 (3d Cir. 2007)).

intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. **Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language."**

.    .    .

Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." ... "This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." **Courts should not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.  In any event, "the polestar of our inquiry . . . is the language of the insurance policy."**

*Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 436 (3d Cir. 2006) (internal citations omitted) (bold added).  For this reason, questions of interpretation of an insurance policy, as well as claims for breach of contract arising from the interpretation and application of that insurance policy, can be resolved in response to a motion to dismiss. *See, e.g., Wilson v. Hartford Cas. Co.*, 2020 U.S. Dist. LEXIS 179896, at *17 (E.D. Pa. Sept. 30, 2020) (citing cases and noting that "[t]his Court and the Third Circuit have regularly granted motions to dismiss in insurance cases when the plaintiff's allegations fall squarely within the policy's exclusions to coverage"); *see also Mark I Restoration Svc. v. Assur. Co. of Am.*, 248 F. Supp. 2d 397, 405 (E.D. Pa. 2003).

In construing the language of an insurance policy, the policy is to be viewed **in its entirety**. *See, e.g., Cordero v. Potomac Ins. Co. of Illinois*, 794 A.2d 897, 900 (Pa. Super. 2002). Moreover, as the Pennsylvania Supreme Court held in *Kvaerner Metals Div. of Kvaerner United States, Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888 (Pa. 2006), words used in an insurance policy that are of common usage are to be construed according to their natural, plain, and

12

ordinary meaning. *See id*. at 897; *see also Treesdale, Inc. v. TIG Ins. Co.*, 2009 U.S. Dist. LEXIS 123970, at *9 (W.D. Pa. Dec. 22, 2009) (same).

Where language of an insurance contract is clear and unambiguous, a court is **required** to give effect to that language. *See, e.g., Camico Mut. Ins. Co. v. Heffler, Radetich & Saitta L.L.P.*, 587 Fed. Appx. 726, 729 (3d. Cir. 2014); *Wilson*, 2020 U.S. Dist. LEXIS 179896, at *16. The language of the policy should not be tortured to create an ambiguity where no such ambiguity exists; rather, the Pennsylvania courts have cautioned that policies should be read in such a manner as to **avoid** ambiguities, if possible. *See, e.g., St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.*, 655 F.2d 521, 524 (3d Cir. 1981); *Wilson*, 2020 U.S. Dist. LEXIS 179896, at *16; *see also Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (noting that the court may not "distort the meaning of language or resort to a strained contrivance in order to find an ambiguity").

A policy provision is only ambiguous if, in the context of the whole policy, it is "'reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *Hammond v. U.S. Liab. Ins. Co.*, 2015 U.S. Dist. LEXIS 9973, at *13 (W.D. Pa. Jan. 28, 2015). **Importantly, "an ambiguity does not exist simply because the parties disagree on the proper construction to be given a particular policy provision."** *Neuhard v. Travelers Ins. Co.*, 831 A.2d 602, 605 (Pa. Super. 2003) (bold added); *see also Nordi v. Keystone Health Plan W., Inc.*, 989 A.2d 376, 381 (Pa. Super. 2010) (holding that policy language is not ambiguous "[j]ust because some people have difficulty understanding" it). Put another way, "'[A]mbiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of its terms.'" *Treesdale*, 2009 U.S. Dist. LEXIS 123970, at *10.

For this reason, although the proper focus in interpreting an insurance policy can sometimes turn on the intent and expectations of the insured, this doctrine is inapplicable where the language of the insurance policy is clear and unambiguous, as "the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations." *Liberty Mut. Ins. Co. v. Treesdale, Inc.*, 418 F.3d 330, 344 (3d Cir. 2005).  As such, the Court may not permit the purported "reasonable expectations" of the insured to override otherwise unambiguous language in the policy, nor may it torture the language of the policy to create an ambiguity where none exists.  *See, e.g., USX Corp. v. Liberty Mut. Ins. Co*., 444 F.3d 192, 198 (3d Cir. 2006) (noting that "courts should not torture the language [of an insurance policy] to create ambiguities but should read the policy provisions to avoid it'").

As the *Wilson* court recently stated in a case nearly identical to this one, "[i]n insurance contract disputes such as this one, where the Plaintiffs allege a wrongful denial of coverage, it is necessary to analyze the claim in three steps: 1) Whether the Plaintiff's claim falls within the scope of coverage; 2) Whether the Defendant has asserted any affirmative defenses, such as a policy exclusion; and 3) Whether there are any applicable exemptions from the exclusion." *Wilson*, 2020 U.S. Dist. LEXIS 179896, at **15-16; *see also Koppers Co., Inc. v. Aetna Cas. and Sur. Co*., 98 F.3d 1440, 1446 (3d Cir. 1996) (noting that the insured has the initial burden to prove coverage); *Madison Construction*, 735 A.2d at 106 ("Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense.").

## V.   ARGUMENT

Plaintiffs' Complaint seeks both a declaratory judgment and breach of contract damages arising out of Utica First's determination regarding Plaintiff's claim for lost business income. For the several reasons discussed below, the Policy does not provide coverage for Plaintiff's claims.

### A.   THE VIRUS EXCLUSION BARS PLAINTIFF'S CLAIM

Although coverage is not available to Plaintiff and/or any of the putative, as yet uncertified class members for a number of reasons discussed more fully below, there is one overarching reason why the Complaint must be dismissed for lack of coverage: that is, that the entirety of Plaintiff's claimed loss falls wholly and exclusively within the Virus Exclusion, which clearly and undeniably unambiguously precludes coverage for any loss, cost, or expense, including those relating to the denial of access to property relating to a virus.

As set forth above, the Policy's coverage for loss of business income is only triggered in the first instance if Plaintiff's "business sustains a necessary 'interruption' resulting from **direct physical loss or damage** to real or personal property **as a result of a covered peril**." Ex. A, at POL094 (bold added). As also noted above, the Policy provides coverage for "direct physical loss or damage" that is not otherwise excluded under the terms of the Policy. *See id*. at POL049. Thus, if Plaintiff's alleged loss of business income is not the result of "direct physical loss or damage" and/or is otherwise excluded from the Policy's definition of "Perils Covered," there is no coverage available for Plaintiff's claim.

Even assuming the existence of the requisite "direct physical loss or damage"—which, as discussed more fully below, is not present here—the Policy very specifically and explicitly excludes "loss, cost or expense caused by, resulting from, or relating to any **virus**, bacterium, or other microorganism that cause disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress" from the perils covered under the Policy. *Id*. at POL100

(bold added). The courts of this Circuit as well as others have uniformly found such an exclusion to be unambiguous and enforceable. *See, e.g., Wilson,* 2020 U.S. Dist. LEXIS 179896, at **18-19 (citing *Certain Underwriters at Lloyds of London v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014); *Sentinel Ins. Co., Ltd. v. Monarch Med Spa, Inc.*, 105 F. Supp. 3d 464, 467, 471-72 (E.D. Pa. 2015); and *Alea London Ltd. v. Rudley*, 2004 U.S. Dist. LEXIS 13259 (E.D. Pa. July 13, 2004)).

It is clear from both Plaintiff's own allegations and the orders attached to the Complaint that the terms of the Virus Exclusion are satisfied. First, it is undisputed that COVID-19 is a virus; indeed, Plaintiff expressly admits this in its Complaint (as it must). *See* Compl., ECF Doc. No. 1, at ¶¶ 3, 67-68; *id.*, Ex. 3, at 1 (noting that "COVID-19" is an acronym for 2019 novel corona**virus**); *see also* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last visited Oct. 19, 2020) (noting that "Coronavirus (COVID-19) is an illness caused by a virus that can spread from person to person").

Second, it likewise is not—and indeed cannot be—disputed that COVID-19 causes or is capable of causing disease, illness, or physical distress. *See, e.g.,* Compl., Ex. 1, at 1 ("WHEREAS, while it is anticipated that a high percentage of those affected by COVID-19 will experience mild influenza-like symptoms, COVID-19 is a disease capable of causing severe symptoms or loss of life, particularly to older populations and those individuals with pre-existing conditions."); *id.*, Ex. 3, at 2 ("WHEREAS, COVID-19 can cause severe disease and death, particularly in older adult and other vulnerable populations"); *see also* https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last visited Oct. 19, 2020) (noting that "COVID-19 symptoms can range from mild (or no symptoms) to severe illness").

Finally, it is clear from Plaintiff's Complaint and the documents attached to it that its alleged loss of business income was the result of the COVID-19 virus. Specifically, Plaintiff's Complaint alleges that "[i]n light of the [COVID-19] pandemic, various state and local authorities prohibited Plaintiff and similar establishments from offering in-store dining." Compl., ECF Doc. No. 1, at ¶ 3; *see also id.* at ¶ 4 ("Efforts to prevent exposure to COVID-19 have caused civil authorities throughout the country to issue orders requiring the suspension of non-essential businesses and preventing citizens from leaving home for non-essential purposes."); *id* at ¶ 70 (noting that Plaintiff was "devastated by the impact of COVID-19"). Moreover, the "Civil Authority Orders" referenced by Plaintiff—including those attached to its Complaint—clearly identify the proliferation of COVID-19 as the reason for the restrictions being put into place. *See, e.g., id.*, Ex. 2, at 2 ("All restaurants and bars previously have been ordered to close their dine-in facilities **to help stop the spread of COVID-19**") (bold added); *id.*, Ex. 3, at 2 ("WHEREAS, scientific evidence shows that preventing unnecessary close contact of individuals is an effective way to **mitigate the spread of communicable diseases like COVID-19**") (bold added). Thus, it was COVID-19 and the efforts to contain its transmission that was the genesis of the orders that Plaintiff blames for its lost business income.

Based on the foregoing, it is clear—both from Plaintiff's own admissions in its Complaint and from the documents attached thereto—that Plaintiff's alleged loss of income was "cause by, result[ed] from, or relat[ed] to" a virus: specifically, COVID-19. All of the damages alleged in the Complaint were therefore the result of a peril that is excluded from the Policy's coverage, and thus the explicit prerequisite for the "Loss of Income" coverage—that the loss of business income be the "result of a covered peril"—is not satisfied.

17

In an effort to avoid the clear and unambiguous terms of the Virus Exclusion, Plaintiff contends that its loss of business income was "not a result of the virus itself, but rather the effect of the Civil Authority Orders as the presence or absence of the COVID-19 virus would have no effect upon the closure or the loss of business inasmuch as the stay at home orders apply to all non-essential businesses regardless of their exposure to the virus." Compl., ECF Doc. No. 1, at ¶ 73. However, Plaintiff's contention is decidedly unavailing for a number of reasons. First, it directly contradicts Plaintiff's own allegations that its business was, in fact, limited **because of COVID-19 and the related governmental efforts to contain the spread of the virus**. *See, e.g., id*. at ¶ 70 (noting that Plaintiff's business was "devastated by the impact of COVID-19"). Thus, Plaintiff's own allegations defeat this attempted end-run around the Virus Exclusion.

Second, it is clear from the terms of the Policy that the Virus Exclusion applies even where there are acts of civil authorities that restrict access to the property. For example, the exclusion states that it "applies to, but is not limited to, any loss, cost, or expense as a result of: … any denial of access to property because of any virus, bacterium, or other microorganism." Ex. A at POL100. Plaintiff's Complaint admits (once again, as it must because the same is public knowledge) that the alleged restrictions on the use of its premises were the results of efforts to contain the spread of COVID-19. Thus, even if Plaintiff's loss of business income was the result of the orders referenced in Plaintiff's Complaint, these orders were undeniably "because of" the COVID-19 virus, such that the Virus Exclusion would apply to preclude Plaintiff's claim in any event. Indeed, Plaintiff's effort to avoid this provision in the Policy would render meaningless this clause in the Policy, as the Virus Exclusion would never apply where an order of a civil authority resulted in the "denial of access to property because of any virus." Under Pennsylvania law, a term of an insurance policy may not be construed so as to render another provision

superfluous. *See, e.g., Doherty v. Allstate Indem. Co.*, 2017 U.S. Dist. LEXIS 52795, at *16 (E.D. Pa. Apr. 6, 2017); *see also Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, 939 F.3d 243, 257 (3d Cir. 2019) (noting "that a policy must be construed in a manner as to give effect to all of its provisions"). Accordingly, Plaintiff's argument is both factually and legally incorrect.

Third, the prefatory language of the "Perils Excluded" section of the Policy expressly provides that if one of the exclusions applies, the Policy does not provide coverage even if "other causes or events … contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events." Ex. A at POL098. The Pennsylvania courts have found that this language "precludes coverage of a loss so long as a specifically enumerated exclusion **contributed in some way to the loss**." *T.H.E. Ins. Co. v. Charles Boyer Children's Trust*, 455 F. Supp. 2d 284, 291 (M.D. Pa. 2006) (bold added); *see also Gillin v. Universal Underwriters Ins. Co.*, 2011 U.S. Dist. LEXIS 21842, at *20 (E.D. Pa. Mar. 4, 2011) ("Under Pennsylvania law, language of a lead-in clause in an insurance policy stating that any loss caused by enumerated exclusions is excluded regardless of any cause or event and regardless if from natural or external forces is unambiguous."). Thus, even if the "Civil Authority Orders" were an independent and separate cause of Plaintiff's alleged loss, it is clear from Plaintiff's own Complaint that these orders combined with COVID-19 to restrict Plaintiff's business. Based on this prefatory clause, the fact that the Virus Exclusion clearly applies is, on its own, sufficient to preclude coverage.

The plaintiffs in *Wilson* made a substantially similar argument to that advanced by Plaintiff here; this argument was rejected by this Court. In *Wilson*, the plaintiffs—an attorney and her law firm—alleged that their insurer breached its insurance policy when it denied coverage for business interruption claims caused by COVID-19 and the resulting governmental

closure orders. *Wilson*, 2020 U.S. Dist. LEXIS 179896, at **1-2. In considering the plaintiffs'

pleadings—which were similar to those in this case—the *Wilson* court held that these pleadings

clearly established that the losses were caused by COVID-19, despite the fact that the plaintiffs

did "not refence [the virus] exclusion or dispute that Coronavirus is a virus." *Id*. at **17-18. In so

holding, the *Wilson* court noted that the policy in that case—like the Policy here—provided that

the virus exclusion applied regardless of the occurrence of a concurrent cause of loss.  *Id*. at *18.

The *Wilson* court therefore held as follows:

> To the extent that Plaintiffs allege that the governmental closure orders are a
> separate cause of loss, Plaintiffs provide no explanation as to why the Civil
> Authority coverage would not be precluded by the virus exclusion. Nor could
> they. The virus exclusion is "added to Paragraph B.1. Exclusions of . . . the
> Special Property Coverage Form." *See id*. at 119. The Civil Authority coverage is
> part of the Special Property Coverage Form. *Id*. at 37.
>
> Even assuming that the governmental closure orders are a separate cause of loss,
> the virus exclusion would still bar coverage because of the anti-concurrent
> causation clause in the virus exclusion which states "[s]uch loss or damage is
> excluded regardless of any other cause or event that contributes concurrently or in
> any sequence to the loss." *Id*. at 119; *see, e.g., Colella v. State Farm Fire & Cas.
> Co*., 407 F. App'x 616, 622 (3d Cir. 2011) (anti-concurrent causation clause in
> insurance policy "negates the application" of the state's causation law) (applying
> Pennsylvania law); *Brodzinski v. State Farm Fire & Cas. Co*., No. CV 16-6125,
> 2017 U.S. Dist. LEXIS 136644, 2017 WL 3675399, at *5 (E.D. Pa. Aug. 25,
> 2017) (coverage for claims for mold and rot prohibited by anti-concurrent clause
> preceding surface water exclusion).

*Id*. at **20-21. On the basis of the foregoing, including the clear and unambiguous language of a

substantially similar virus exclusion, this Court in *Wilson* court granted the defendants' motions

to dismiss under Rule 12(b)(6). *Id*. at **21-23.

For all of the foregoing reasons, the reasons cited in *Wilson*, and the overwhelming

weight of legal authority cited by and relied upon by the *Wilson* court in reaching its decision,

Plaintiff's Complaint fails to state a claim that its alleged loss of business income was covered

under the Policy. Plaintiff's Complaint should therefore be dismissed with prejudice.

**B.      THE POLICY'S "CIVIL AUTHORITY" COVERAGE DOES NOT APPLY**

For the reasons discussed above, this Court need not look beyond the Virus Exclusion to consider and grant Utica First's Motion. Even if it is inclined to do so, however, the Policy also expressly excludes losses or damage caused by an "order of any civil authority" from the Perils Covered under the Policy. *See* Ex. A, at POL098. Although it is true that the Policy does extend some coverage for business interruption caused by orders of a civil authority, it is **only** under certain specific circumstances, none of which—as discussed below—is applicable here.

To this end, the Policy specifically provides that civil authority coverage may be available for business interruption if but only if: (1) Plaintiff was "specifically **denied** …access" to its premises by an order of a civil authority; (2) the order of the civil authority resulted from "damage to property other than at the described premises **that is caused by a covered peril**"; (3) Plaintiff's premises is within one mile of the damaged property and within the area where access is **denied** by civil authority; and (4) the order is initiated by the civil authority to allow it "to have access to the damaged property without interference, or is due to dangerous conditions as a result of the damage or continuation of the **covered peril** that caused the damage." *Id*. at POL096 (bold added). As this Court correctly recognized in *Wilson*, because this "coverage extension" operates as an exception to the aforementioned exclusion, it is Plaintiff's burden to demonstrate that the exception applies. *See Wilson*, 2020 U.S. Dist. LEXIS 179896, at **15-16.

Plaintiff's Complaint fails to carry this burden. For example, Plaintiff's Complaint does not allege that Plaintiff was "specifically denied" or prohibited access to the insured premises. To the contrary, Plaintiff's Complaint and the orders attached thereto expressly state that Plaintiff was permitted to continue its operations in the form of take-out service, delivery, and phone or online ordering, and that it did in fact do so; it was only dine-in service and walk-in ordering that were restricted. *See, e.g.,* Compl., ECF Doc. No. 1, at ¶¶ 55-56; *id*., Ex. 2, at 2; *id*.,

Ex. 3, at 3. Thus, rather than close Plaintiff's premises, the orders cited by Plaintiff as the cause of its alleged loss of business income **explicitly allowed Plaintiff to continue its operations, albeit in a limited manner**. At most, therefore, Plaintiff's Complaint alleges that it was merely limited or hindered in its use of its premises. As this Court's sister court has held, such an allegation is insufficient to qualify as the denial or prohibition on the use of Plaintiff's property that is necessary to satisfy the exception to the exclusion for "Civil Authority." *See, e.g., Ski Shawnee, Inc. v. Commonwealth Ins. Co.,* 2010 U.S. Dist. LEXIS 67092, at \*10 (M.D. Pa. July 6, 2010) ("However, where the action of a civil authority merely hinders access to the covered premises, without completely prohibiting access, federal courts have held that such action is not covered under policies like the one in the instant case.") (citing *Southern Hospitality, Inc. v. Zurich American Ins. Co.*, 393 F.3d 1137, 1140-41 (10th Cir. 2004)). Accordingly, Plaintiff's Complaint fails to plead facts that satisfy the very first requirement of the exception to the "Civil Authority" exclusion.

Plaintiff likewise cannot satisfy the second requirement of the exception: that the orders of the Commonwealth of Pennsylvania and the City of Philadelphia resulted from damage to property other than at the described location that was caused by a "covered peril." As discussed more fully below, not only does this exception to the exclusion fail because Plaintiff has not alleged that the government closure orders were the result of physical damage to property **anywhere**, let alone within a one mile radius of the described property. Even if it could prove this, however, any such physical damage is necessarily related to COVID-19; as such, it is expressly excluded under and by virtue of the clear and unambiguous language of the Virus Exclusion. Thus, even if Plaintiff is correct in its unsupported, vague, and dubious assertion that other businesses within one mile of its premises—such as a Rite Aid, a CVS, and the

Philadelphia Policy Department and Fire Department—"routinely and customarily destroy numerous items of physical property believed to be contaminated by COVID-19," Compl., ECF Doc. No. 1, at ¶¶ 52-53, it cannot escape its own allegation that the undefined "property" was contaminated by **a virus**. Thus, any alleged "damage" to this property was caused by an excluded peril. Furthermore, it is clear that the orders issued by the Governor of Pennsylvania and the Mayor of Philadelphia were intended to promote social distancing and avoid gatherings of people in a setting that would be conducive to the transmission of COVID-19. *See, e.g., id*., Ex. 2, at 2. By their own terms, these orders were not the result of any **prior** property damage, and they are therefore insufficient to invoke the exception. *See, e.g., Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) (noting that the civil authority coverage "requires proof of a causal link between **prior damage** and civil authority action") (bold added); *Kelaher, Connell & Conner, P.C. v. Auto-Owners Ins. Co.*, 440 F. Supp. 3d 520, 529 (D.S.C. 2020) (holding that there "must be some link between the civil authority order and damage to adjacent property. Thus, without a nexus between the issuance of the civil authority order and the damage to an adjacent property, there is no coverage"); *Jones v. Chubb Corp*., 2010 U.S. Dist. LEXIS 109055, at *9 (E.D. La. Oct. 11, 2010) ("Reading the Civil Authority section as a whole, it is clear that it was not written with the expectation that a civil authority order prohibiting access would issue *before* the property damage that forms the basis of the order actually occurs. The direct nexus between the damage sustained and the order that the policy requires suggests that the Policy was designed to address the situation where damage occurs and the civil authority *subsequently* prohibits access.") (emphasis in original). Accordingly, the allegations of Plaintiff's Complaint fail to satisfy the second requirement for the coverage extension.

Plaintiff's Complaint also fails to satisfy the third requirement for the coverage extension, as Plaintiff's premises is not within any area where access was **denied** by the orders of the Commonwealth of Pennsylvania and the City of Philadelphia. As noted above, none of the orders included with Plaintiff's Complaint expressly prohibits Plaintiff's access to its property. To the contrary, these orders expressly **allow** Plaintiff to continue to use its premises, albeit with some restrictions. Thus, even if Plaintiff is correct in its dubious and unsupported assertion about other business within one mile of Plaintiff's premises that were destroying property containing COVID-19, it cannot avoid its own admission that it was not completely denied access to its premises by the "Civil Authority Orders" it cites.

Finally, for the same reasons discussed above, Plaintiff's Complaint fails to plead facts that satisfy the fourth requirement of the coverage extension. Specifically, Plaintiff's allegations and the orders attached to its Complaint clearly demonstrate that the purpose of the various orders was **not** to permit civil authorities to have access to the damaged property. To the contrary, the purpose of the orders was to **reduce** the number of people that would congregate in one area, and to promote social distancing, all in an effort to curtail the spread of COVID-19. Moreover, even if there were "dangerous conditions" in or around Plaintiff's premises, the only cause of these "dangerous conditions" that is identified in the Complaint is the presence of COVID-19. Because COVID-19 is an expressly-excluded peril, Plaintiff cannot satisfy the fourth requirement for the extension of coverage for business interruption caused by orders of a civil authority.

For all of the foregoing reasons, the extension of coverage for "Loss of Income" due to "Interruption By Civil Authority" does not apply under the facts pleaded in Plaintiff's Complaint. Accordingly, Plaintiff's Complaint fails to state a cognizable claim for coverage

under the Policy, and the instant action must therefore be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

> **C.   PLAINTIFF'S COMPLAINT FAILS TO ALLEGE PHYSICAL LOSS OF, OR DAMAGE TO, ITS OWN PROPERTY OR PROPERTY NEARBY**

The Policy itself is only triggered in the first instance by "direct physical loss or damage unless…limited or…excluded," and coverage for "Loss Of Income" is likewise only available where Plaintiff's business sustained an "interruption" caused by "direct physical loss or damage to real or personal property as a result of a covered peril." Ex. A, at POL094. As discussed in the preceding sections, COVID-19—as a virus—is not a "covered peril" within the meaning of the Policy; any loss resulting therefrom is otherwise wholly excluded in any event. Thus, Plaintiff is not entitled to the coverage for "Loss Of Income." However, even if this were not enough to deny Plaintiff's claim out of hand, its Complaint also fails to plead facts demonstrating that the alleged "interruption" in Plaintiff's business was caused by the "direct physical loss" required to trigger coverage.

Without much further discussion or support, Plaintiff's Complaint baldly alleges that "It is beyond any legitimate dispute that all property, including Plaintiff's property, has been damaged by COVID-19, because it is a physical substance, which lives on and is active on inert physical surfaces, that attached to and deprived Plaintiff of its property, resulting in direct physical loss." Compl., ECF Doc. No. 1, at ¶ 60. However, this assertion is, in the first instance, contradicted by Plaintiff's own allegations, which expressly state that "there is no evidence of anyone contracting COVID-19 on Plaintiff's premises or contamination of the Covered Property." *Id.* at ¶ 54. Thus, even if contracting and/or being contaminated by a virus was sufficient to satisfy the "direct physical loss" prerequisite under the policy, Plaintiff's own

allegations concede that there was no such damage; as such, Plaintiff's Complaint undermines its assertion that it has somehow suffered "direct physical loss."

Notably, for the purposes of first-party property damage coverage, the courts of this Circuit and other courts have consistently held that "physical" loss does not include economic losses or other intangible damages and require some actual physical component. *See, e.g., Port Auth. of NY & NJ v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration'"); *see also Motorists Mut. Ins. Co. v. Hardinger*, 131 Fed. App'x 823, 826-27 (3d Cir. 2005) (noting that the test for coverage was "whether the functionality of the [insureds'] property was nearly eliminated or destroyed, or  whether their property was made useless or uninhabitable of its structure"); *Mama Jo's, Inc. v. Sparta Ins. Co.*, 2018 U.S. Dist. LEXIS 201852, at *25 (S.D. Fla. June 11, 2018) ("Here, the restaurant was not 'uninhabitable' or 'unusable.' In fact, the restaurant remained open every day, customers were always able to access the restaurant, and there is no evidence that dust [from nearby roadwork] had an impact on the operation other than requiring daily cleaning. … The fact that the restaurant needed to be cleaned more frequently does not mean Plaintiff suffered a direct physical loss or damage. …"); *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 331 (S.D.N.Y. 2014) (noting that "[t]he words 'direct' and 'physical,' which modify the phrase 'loss or damage,' ordinarily connote actual, demonstrable harm of some form to the premises itself, rather than forced closure of the premises for reasons exogenous to the premises themselves, or the adverse business consequences that flow from such closure").

Allegations of purely economic loss are thus insufficient to satisfy the requirement of physical property damage. *See, e.g., Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280,

287 (S.D.N.Y. 2005) (applying Pennsylvania law and noting that purely economic damages as a result of loss of use of a parking lot were not sufficient to trigger coverage in the absence of physical damage). At most, Plaintiff's Complaint appears to allege that Plaintiff lost partial use of its premises; the Complaint does not allege—and indeed it cannot, given the orders attached to the Complaint—that Plaintiff's premises was physically altered, such that it lost complete access to, and use of, its premises. Accordingly, Plaintiff has failed to plead facts supporting its assertion that it suffered "direct physical loss" as a result of the various governmental orders.

For these additional reasons, Plaintiff has failed to state a cognizable claim for coverage under the Policy, and its claims in this action should be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6) for this reason as well.

**D.     COURTS AROUND THE COUNTRY HAVE REJECTED CLAIMS LIKE THOSE MADE BY PLAINTIFF**

Like Pennsylvania and Philadelphia, state and local governments throughout the country have implemented a variety of orders intended to slow the spread of COVID-19. As was the case with Plaintiff, many of these orders restricted certain aspects of business operations, including restrictions on indoor dining and other in-person events. Like Plaintiff, many of the restaurants and other businesses affected by these restrictions sought coverage under insurance policies that had coverage similar to that in the Policy at issue in this case.

However, when presented with such claims, courts around the country—including this Court—have resoundingly rejected the assertion that coverage under a policy like that issued to Plaintiff extends to business income losses resulting from COVID-19 related restrictions. These courts have therefore allowed for the dismissal of such claims even at the pre-answer stage. *See, e.g., Wilson*, 2020 U.S. Dist. LEXIS 179896, at \*\*23-24; *see also Vandelay Hospitality Group v. Cincinnati Ins. Co.*, 2020 U.S. Dist. LEXIS 185581, at \*\*1-3 (N.D. Tex. Oct. 7, 2020); *Henry's*

*La. Grill v. Allied Ins. Co. of Am.*, 2020 U.S. Dist. LEXIS 188353, at \*\*6-19 (N.D. Ga. Oct. 6, 2020); *Mark's Engine Co. No. 28 Rest. v. Travelers Indem. Co.*, 2020 U.S. Dist. LEXIS 188463, at \*\*5-17 (C.D. Cal. Oct. 2, 2020); *Surgeons v. Cincinnati Ins. Co.*, 2020 U.S. Dist. LEXIS 184772, at \*\*2-3 (S.D. Iowa Sept. 29, 2020); *Franklin EWC, Inc. v. Hartford Fin. Servs. Group*, 2020 U.S. Dist. LEXIS 174010, at \*\*3-13 (N.D. Cal. Sept. 22, 2020); *Sandy Point Dental, P.C. v. Cincinnati Ins. Co.*, 2020 U.S. Dist. LEXIS 171979, at \*\*3-8 (N.D. Ill. Sept. 21, 2020); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 2020 U.S. Dist. LEXIS 168385, at \*\*7-25 (N.D. Cal. Sept. 14, 2020); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.,* 2020 U.S. Dist. LEXIS 166808, at \*\*7-17 (C.D. Cal. Sept. 11, 2020); *Plan Check Downtown III, LLC v. AmGuard Ins. Co.*, 2020 U.S. Dist. LEXIS 178059, at \*\*4-16 (C.D. Cal. Sept. 10, 2020); *Turek Enters. v. State Farm Mut. Auto. Ins. Co.*, 2020 U.S. Dist. LEXIS 161198, at \*\*12-25 (E.D. Mich. Sept. 3, 2020); *Martinez v. Allied Ins. Co. of Am.*, 2020 U.S. Dist. LEXIS 165140, at \*\*3-7 (M.D. Fla. Sept. 2, 2020); *10E, LLC v. Travelers Indem. Co.*, 2020 U.S. Dist. LEXIS 156827, at \*\*9-15 (C.D. Cal. Aug. 28, 2020); *Malaube, LLC v. Greenwich Ins. Co.,* 2020 U.S. Dist. LEXIS 156027, at \*\*8-27 (S.D. Fla. Aug. 26, 2020); *Diesel Barbershop, LLC v. State Farm Lloyds*, 2020 U.S. Dist. LEXIS 147276, at \*\*12-23 (W.D. Tex. Aug. 13, 2020); *Rose's 1, LLC v. Erie Ins. Exch.*, 2020 D.C. Super. LEXIS 10, at \*\*3-14 (D.C. Super. Ct. Aug. 6, 2020).

Utica First respectfully submits that the overwhelming weight of the case law further supports its request that Plaintiff's action be dismissed with prejudice.

## VI.    <u>CONCLUSION</u>

Without minimizing the global impact that the COVID-19 virus has had on us all and on the restaurant industry in particular, it is respectfully submitted that we must remain laser-focused on the precise, narrow issue at hand: that is, whether the Policy issued by Utica First to Plaintiff provides coverage for Plaintiff's COVID-19-related business interruption loss. For the

reasons discussed above, it simply does not. Not only has Plaintiff failed to establish the requisite direct physical loss or property damage but, even if it had, there is no avoiding the application of the Virus Exclusion, which precludes coverage for all virus-related losses—including those relating to the denial of access to property. COVID-19 is undisputedly a virus, and the governmental closure/shut down orders cited in Plaintiff's Complaint were issued **because of** this virus. Even on the most generous reading of Plaintiff's Complaint, the inescapable conclusion is that all of its losses were undeniably caused by, resulted from, and/or related to the COVID-19 virus, so as to fall squarely within the exclusion.

Accordingly, Plaintiff's Complaint fails to state a cognizable claim for coverage under the Policy. Plaintiff's claims for breach of contract and a declaratory judgment must therefore be dismissed, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted,

**POST & SCHELL, P.C.**

BY:      **/s/  Steven J. Schildt_____**
         **STEVEN J. SCHILDT, ESQ.**
         **I.D. # 79011**
         **BRYAN M. SHAY, ESQ.**
         **I.D. # 205953**
         Attorneys for Defendant
         1600 JFK Blvd., 13th Floor
         Philadelphia, PA 19103
         Phone: 215-587-1089
         E-mail: sschildt@postschell.com

**DATE:  10/21/20**